**LEAH C. LIVELY, OSB #962414**
leahlively@dwt.com
**SARAH E. AMES, OSB #132675**
sarahames@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
Telephone:  (503) 241-2300
Facsimile:  (503) 778-5299

>       Attorneys for Defendant
>       Wells Fargo Bank, N.A.

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### AT PORTLAND

| | |
|---|---|
| **DUKE TRAN,**<br><br>               Plaintiff,<br><br>v.<br><br>**WELLS FARGO BANK, N.A.,**<br><br>               Defendant. | Case No. 3:15-cv-00979-BR<br><br>**EXHIBIT 3, PART 1 TO THE DECLARATION OF LEAH C. LIVELY** |

**DAVIS WRIGHT TREMAINE** LLP

By _____S/ Leah C. Lively_____
**Leah C. Lively, OSB # 962414**
leahlively@dwt.com
**Sarah E. Ames, OSB #132675**
sarahames@dwt.com
Attorneys for Defendant Wells Fargo Bank, N.A.

Page 1 –  EXHIBIT 3, PART 1, TO THE DECLARATION OF LEAH C. LIVELY

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

DUKE TRAN                                                    May 19, 2017
TRAN vs WELLS FARGO BANK                                              13

```
 1        Q.    Okay.  Has that ever influenced your

 2   ability to work as a telephone customer service

 3   agent?

 4        A.    No.

 5        Q.    Has anyone ever told you that they have a

 6   hard time understanding you because of your accent?

 7        A.    Yes, it's possible.

 8        Q.    Okay.  Outside of the workplace, has

 9   anyone ever said that to you?

10        A.    The customer on the phone.

11        Q.    Okay.

12        A.    Yes.

13        Q.    Is that something that's happened just

14   occasionally, or is it -- is that something that

15   happens more than five times a year?

16        A.    It sometime.  When we talk to the

17   customer, sometime you have an accent, but a

18   customer make a comment we have an accent.

19        Q.    Okay.  And I guess what I'm trying to find

20   out is how often does that happen?

21        A.    It's not very often.

22        Q.    Maybe once a month?

23        A.    No, not that.

24        Q.    Not even that?  Maybe three or four times

25   a year?
```



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment                   Page 1 of 125

```
 1         A.   I did not recall.  I'm sorry.
 2         Q.   Okay.  Okay.  But it happens from time to
 3    time with the customers; is that a fair statement?
 4         A.   I didn't recall.  It's once in a little
 5    while, yeah.
 6         Q.   Okay.
 7         A.   I'm not sure.  At the time, I did not
 8    know.
 9         Q.   Can you -- I'm sorry.  You have a quiet
10    voice.  Can you say that again.
11         A.   I said I did not recall.
12         Q.   When?
13         A.   It's once in a little while.  Yeah, I'm
14    not sure how long, how many a year.
15         Q.   Okay.  Do you know if that ever happened,
16    if a customer ever made a comment to you about your
17    accent when you were working as a customer service
18    agent in Wells Fargo's HEMASS department?
19         A.   Yes, it's possible.
20         Q.   Okay.  I'm assuming -- you know, these
21    were many years ago -- you wouldn't -- you wouldn't
22    remember what date that happened on or who the
23    customer was or anything like that?
24         A.   Yes, that's possible.
25         Q.   Okay.  It's possible.
```



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 2 of 125

1  | CMP department selected customer service calls for
2  | review?
3  |        A.   For the QA monitor, yes.
4  |        Q.   How did they do that?
5  |        A.   They monitor the call to make sure you are
6  | -- I mean, for coaching purposes.
7  |        Q.   For --
8  |        A.   For coaching.
9  |        Q.   -- coaching?
10 |        A.   For coaching purposes, yes.
11 |        Q.   Okay.  So CMP monitored the calls for
12 | coaching purposes.  Is that what you said?
13 |        A.   Yes.
14 |        Q.   Okay.  Do you know how CMP decided which
15 | calls to listen to?
16 |        A.   I do not work for the QA department.  I'm
17 | not sure how they go in there.  They could be pick
18 | up any call they want, and I don't know what they
19 | do.
20 |        Q.   Okay.  That's what I -- I'm just trying to
21 | find out if you -- There's going to be a lot of
22 | things that we talk about, that you know about
23 | because those things were your job and you received
24 | training on them; and there's going to be some
25 | things that I'm assuming I'm going to ask you about,



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment                   Page 3 of 125

1  that weren't part of your job and you may not know

2  about them.  I'm just trying to find that out.

3      A.   Okay.

4      Q.   And so the question is, and I think you

5  answered it:  Do you know how the CMP department

6  selected which calls it was going to review?

7      A.   No, I don't.

8      Q.   Did you ever talk with someone from the

9  CMP department and ask them how they selected calls

10 for review?

11     A.   No, they not allowed to.

12     Q.   Was the CMP department kept pretty

13 separate from your department?

14     A.   Yes.

15     Q.   Do you have any information that, during

16 the time you worked for Wells Fargo, Peter LeDonne

17 or Kimberly Thrush had the ability to influence

18 which calls were selected by the CMP for review?

19     A.   I apologize.  Can you explain that one

20 more time.

21     Q.   Of course.  Do you have any information

22 that, during the time you worked for Wells Fargo,

23 Peter LeDonne or Kimberly Thrush had the ability to

24 influence which calls the CMP reviewed?

25     A.   It's possible, yes.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 4 of 125

1  that every month the CMP would select a certain

2  amount of calls and they would review them and score

3  them; correct?

4       A.   Yes.

5       Q.   Okay.  What I'm trying to find out is if

6  you had -- if Ms. Thrush or any other manager ever

7  told you that the HEMASS manager had the ability to

8  tell CMP, in selecting those calls for the month,

9  which calls they should review.

10       A.   Possible, yes.

11       Q.   Okay.  Who told you that?

12       A.   Kimberly said management communicate each

13  other.  They go through all the call and they

14  communicate with the QA.  So that what I know.

15       Q.   Okay.  Sir, I understand that management

16  between CMP and HEMASS communicated.  I'm asking you

17  something more specific.

18       A.   Okay.

19       Q.   Do you have any information, from any

20  source, that a HEMASS manager could tell the CMP

21  department which calls they were going to review?

22       A.   That, I did not recall.

23       Q.   Do you have any information that any of

24  the CMP evaluators knew that you took family leave

25  in June of 2014?



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment                Page 5 of 125

DUKE TRAN                                           May 19, 2017
TRAN vs WELLS FARGO BANK                                        66

1        A.    That, I don't remember.

2        Q.    Did you ever tell anyone from the CMP that

3    you took family leave in June of 2014?

4        A.    That something I did not recall.

5        Q.    Did anyone from CMP ever tell you that

6    they were aware that you had taken family leave in

7    June of 2014?

8        A.    I report to the command center, not the QA

9    department.

10        Q.    Right.  So would the answer to that

11    question be no, that --

12        A.    It's no.

13        Q.    Okay.  Do you have any information that

14    anyone from the CMP department was aware that you

15    had reported what you believed to be unlawful

16    conduct with regard to deceiving customers about

17    missing loan documents?

18            MS. STEPHENSON:  Objection.  Calls for

19    speculation.

20        Q.    BY MS. LIVELY:  Go ahead.

21        A.    Can you repeat that one more time.  I'm

22    sorry.  Can you explain that.

23        Q.    Yes.  I'm asking if -- So one of your

24    allegations in this case is that you believed Wells

25    Fargo was engaging in unlawful conduct with regard

Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 6 of 125

1   to deceiving customers about missing loan documents;

2   correct?

3         A.   I still do not understand the question.

4         Q.   Okay.  Do you understand that one of your

5   allegations, one of your claims against Wells

6   Fargo --

7         A.   Right.

8         Q.   -- is that they were doing something

9   unlawful by deceiving customers as to missing loan

10  documents?

11        A.   Yes.

12        Q.   Do you have any information that the CMP

13  department was aware that you had opposed this

14  unlawful -- what you believed to be unlawful

15  activity?

16        A.   Can you repeat it one more time.

17        Q.   Sure.  Did you --

18        A.   I'm sorry.

19        Q.   Did you ever tell anyone in the CMP

20  department that you had opposed what you believed to

21  be unlawful conduct with regard to missing customer

22  loan department documents?

23        A.   We not allowed to talk to the CMP

24  department.

25        Q.   Okay.  So the answer to that question



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment               Page 7 of 125

```
 1    is --
 2         A.   No.
 3         Q.   -- no, you never told anyone in the CMP;
 4    correct?
 5         A.   No.
 6         Q.   Okay.  Did anyone from the CMP department
 7    ever indicate to you that they were aware that you
 8    had opposed what you believed to be unlawful conduct
 9    with regard to missing loan documents?
10         A.   Can you explain one more time.
11         Q.   Sure.
12         A.   Please.
13         Q.   Did anyone from the CMP department ever
14    indicate to you that they knew you had reported what
15    you believed to be unlawful conduct with regard to
16    loan documents?
17         A.   No.
18         Q.   Do you have any information, from any
19    source, that the CMP scores that you received were
20    influenced by your report of unlawful conduct with
21    regard to missing loan documents?
22         A.   Can you explain in little more detail.
23    I'm sorry.
24         Q.   Yes.  Do you have -- Do you -- Do you have
25    any information from anyone -- something you read,
```

ESQUIRE
DEPOSITION SOLUTIONS

Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 8 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
70

1    that part.

2         Q.    What are you not understanding?

3         A.    You asked me the question.  I did not know

4    what meaning on that.

5         Q.    Do you believe that the CMP department

6    knew that you had reported what you believed to be

7    unlawful conduct with regard to missing all the

8    documents?

9         A.    I did not recall at that time.  It's been

10   a while.  I don't remember.

11        Q.    Do you have any information or evidence

12   that the CMP department was aware that you had

13   reported what you believed to be unlawful conduct

14   with regard to missing loan documents?

15        A.    I did not recall that.

16        Q.    Is there anything that you could look at

17   that would help you recall that?

18        A.    It's been what, three year?  I don't

19   remember much.

20        Q.    Well, that's -- that's what I'm asking.

21             Is there something that you could look at

22   that would help you remember whether you thought the

23   CMP department was aware that you'd reported what

24   you thought to be unlawful conduct?

25        A.    Well, CMP QA is for coaching -- coach and



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 9 of 125

```
 1   monitor purposes.  You don't report to QA.
 2        Q.   I understand that, Mr. Tran.
 3             What I'm trying to find out is if you
 4   believe that the CMP department manipulated their
 5   review of your calls as a way of getting back at you
 6   for complaining of unlawful activity with regard to
 7   missing loan documents.
 8             MS. STEPHENSON:  Objection.  Calls for
 9   speculation.
10             THE WITNESS:  I did not recall what --
11   what QA do at that time.  Been a while.
12        Q.   BY MS. LIVELY:  I'm asking if you believe
13   that.
14        A.   I don't know how to answer the question.
15        Q.   Well, it seems like a yes or no:  Do you
16   believe that your CMP scores from the CMP department
17   were influenced in some way by the fact that you had
18   made a report of unlawful activity?
19        A.   It's possible.
20        Q.   Okay.  What do you base that on?
21        A.   QA can go in there and pick up any call
22   they monitor to.  And you never talk to QA, we're
23   not allowed to.  They're the coaching on the
24   supervisor, for coaching.
25        Q.   Okay.  Do you have any information, from
```



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                   Page 10 of 125

 1   any source, that the QA department was aware that

 2   you had made a report of unlawful activity with

 3   regard to missing customer documents?

 4         A.   I did not recall.

 5         Q.   If you had thought that the QA department

 6   was giving you scores to retaliate against you,

 7   would you have told human resources that?

 8         MS. STEPHENSON:  Objection.  Calls for

 9   speculation.

10         THE WITNESS:  It's been a while.  I did

11   not remember.

12         Q.   BY MS. LIVELY:  Do you have any

13   information, Mr. Tran, that Kimberly Thrush or Peter

14   LeDonne had the ability to alter your phone calls

15   before they went to the CMP?

16         A.   It's possible, yes.

17         Q.   Okay.  What do you base that on?

18         A.   Kimberly and Peter can access all the QA

19   monitoring system, also; that why they give score

20   for coaching.

21         Q.   I understand that.  But what I'm asking

22   you is if, other than a possibility in your mind, do

23   you have any actual information that Peter LeDonne

24   or Kimberly Thrush had the ability to alter a

25   customer call before it went to CMP?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment           Page 11 of 125

1        A.   It's possible, yes.

2        Q.   Okay.  And do you have any -- any

3   information to back that up, other than because you

4   think that might be a possibility?

5        A.   It's because they get access to QA, call

6   monitor, with their ability; and then they send to

7   the QA for monitor, for coaching.

8        Q.   So do you know that, by accessing the

9   calls, they have the ability to alter the calls?

10       A.   That is something I did not recall.

11       Q.   And were you aware that QA selected the

12  calls, and not the HEMASS managers, for CMP review?

13       A.   Possible, yes.

14                 (Exhibit 64 marked.)

15            THE WITNESS:  Thank you.

16       Q.   BY MS. LIVELY:  Mr. Tran, the court

17  reporter has handed you what's been marked as

18  Exhibit 64 in this case.

19            Do you have that document in front of you?

20       A.   Yes.

21       Q.   And Exhibit 64 is the memorandum of

22  understanding that Ms. Thrush and Mr. LeDonne

23  presented to you on or around July 22nd, 2014; is

24  that correct?

25       A.   I did not recall what dates, exactly what



1    dates.

2         Q.    Do you recall being given the memorandum

3    of understanding in July of 2014?

4         A.    Yes.

5         Q.    And looking at the July memorandum of

6    understanding, the first paragraph states, quote:

7    "This memo confirms that you did not attend the two

8    instances of creating customer loyalty trainings

9    that HEMASS has offered, year to date," end quote.

10        Did I read that correctly, Mr. Tran?

11        A.    Yes.

12        Q.    And was that a true statement?  Had you

13   not attended the first two offerings of the CCL

14   training?

15        A.    Possible, yes.  I did not remember

16   exactly.

17        Q.    Do you have any reason to dispute that you

18   did not attend the first two instances of the CCL

19   training in 2014?

20        A.    It's been for a while.  I did not remember

21   exactly what date.

22        Q.    Well, I'm not asking about specific dates.

23   I'm asking if you have any reason to dispute that

24   you missed the first two CCL trainings that were

25   offered in 2014.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 13 of 125

1      A.   Well, I remember June.  I'm not sure about

2  July.

3      Q.   No, the other one was in January.

4           Do you remember that there was a CCL

5  training in January that you missed because you were

6  sick?

7      A.   Possible, yes.

8      Q.   So do you have any reason to dispute that

9  you missed the first two offerings of the CCL

10  training in 2014, as of the time that you were given

11  the memorandum of understanding?

12      A.   I did not remember when I was missing the

13  one in January, but I know the one in June I was

14  missing a training class.  I was sick and my son

15  also was sick.

16      Q.   So is it your testimony that you just

17  don't remember one way or another whether you missed

18  the first offering of the CCL training in 2014?

19      A.   Yes, I did not recall.  Been a while, been

20  a long time.

21      Q.   Do you have any reason to dispute that you

22  missed the January 2014 CCL training?

23      A.   I did not remember.

24      Q.   Okay.  The second sentence of the MOU

25  states, quote:  "Because CCL training is a



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 14 of 125

1   requirement for the customer service representative

2   position, and because the CCL model is required to

3   properly and uniformly service customers in HEMASS,

4   we will provide you an individual review of the

5   model for you and then work to ensure you are in

6   attendance at the next time CCL is offered."

7           Do you see that?

8       A.   Yes.

9       Q.   And do you have any information to dispute

10  that the CCL training was in fact mandatory for

11  customer service agents in HEMASS?

12      A.   I'm sorry.  Say it one more time, please.

13      Q.   Sure.  Do you have any reason to dispute

14  the statement that the CCL training was mandatory

15  for customer service agents in HEMASS?

16      A.   No.

17      Q.   And do you have any information to dispute

18  the statement that we just read, that the purpose of

19  the CCL training was to properly and uniformly

20  service customers in HEMASS?

21      A.   Yes.

22      Q.   Why do you dispute that?

23      A.   Oh, I'm sorry.  I didn't understand the

24  question.  I thought --

25      Q.   Okay.  Let me -- Let me ask it again.



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment           Page 15 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
77

1           Do you have any reason to dispute the
2    statement that the purpose of the mandatory CCL
3    training was to properly and uniformly service
4    customers in HEMASS?
5          A.   I did not dispute it.
6          Q.   Okay.  Do you have any information that
7    other HEMASS customer service agents were allowed to
8    miss the mandatory CCL training?
9          A.   Not that I recall.
10          Q.   Do you have -- Do you -- Strike that.
11               Are you aware of whether any other HEMASS
12    agents in your department missed the CCL training?
13          A.   Possible, yes.
14          Q.   Who missed the CCL training?
15          A.   I did not recall.  People get sick.
16          Q.   Well, I don't want you to guess.  I want
17    you to tell me, as you sit here today, if you have a
18    specific memory that a co-worker also missed the CCL
19    training.
20          A.   That, I did not recall.  It possible, yes.
21          Q.   Do you know if any HEMASS agents were
22    allowed to continue to work in customer service if
23    they did not attend the CCL training?
24          A.   I'm sorry.  Can you ask that one more
25    time, please.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 16 of 125

1      Q.   Sure.   Do you have any information that if

2   a HEMASS customer service agent did not attend CCL

3   training, he or she would have been allowed to

4   continue to work as a customer service agent?

5           A.   I don't recall that.

6      Q.   Was it your understanding that if the CCL

7   training wasn't completed, you may no longer be able

8   to continue to work as a customer service agent?

9           A.   Well, you can retrain it.   We have a

10   different class.   I did go to the second training

11   class after September.

12      Q.   I'm saying if they never completed it.

13           I'm trying to find out if you understood

14   that by saying "mandatory," the CCL class was a

15   requirement of being a customer service agent in

16   HEMASS.

17           Did you understand that?

18      A.   Yes.

19      Q.   Do you know who made the decision to issue

20   the July 2014 memorandum of understanding to you?

21      A.   It Kimberly.

22      Q.   And how do you know she's the one who made

23   the decision?

24      A.   She call me in office with Peter.

25      Q.   And did she tell you that she had made the



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                    Page 17 of 125

1    decision to issue you the memorandum of

2    understanding?

3           A.    She did that first, before I go into her

4    office.

5           Q.    Okay.  Do you know if she consulted with

6    anyone else in deciding to issue you the memorandum

7    of understanding?

8           A.    Not that I recall.

9           Q.    And do you have any personal knowledge of

10    what factors Kimberly considered in deciding to

11    issue you the July memorandum of understanding?

12           A.    I did not know what Kimberly did in that

13    time.

14           Q.    You eventually attended the CCL training

15    in September of 2014; correct?

16           A.    Yes.

17           Q.    And after taking it, you agreed that it

18    was helpful training for your job as a customer

19    service agent in HEMASS; correct?

20           A.    Yes.

21           Q.    And returning to the second sentence of

22    the July memorandum of understanding, it states

23    that, essentially, in the interim time between you

24    receiving the memo and the next CCL training, Wells

25    Fargo would provide you with an individual review of



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                    Page 18 of 125

1    the CCL model; is that correct?

2         A.    Yes.

3         Q.    And Wells Fargo did that; correct?

4         A.    Yes.

5         Q.    And do you recall that on or around July

6    25th, 2014, Peter LeDonne and Caz Moreland met with

7    you for approximately two hours to provide you a

8    summary of the CCL training?

9         A.    Yes.

10         Q.    And during that meeting, you were provided

11    with the team member skills handout, call flow

12    handout, and CCL training handbook; correct?

13         A.    That is correct.

14         Q.    And isn't it true that you found this

15    individualized training that Mr. LeDonne and

16    Ms. Moreland provided to you helpful to you as a

17    customer service agent?

18         A.    Yes.

19         Q.    Would you agree, Mr. Tran, that the

20    individual training of the CCL model that you

21    received assisted you in succeeding in your job?

22         A.    Yes.

23              (Exhibit 65 marked.)

24         THE WITNESS:   Thank you.

25              (Sotto voce remarks.)

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 19 of 125

```
 1              MS. LIVELY:  Okay.  Sorry.  What number
 2      did you tell us?
 3              THE REPORTER:  Sixty-five.
 4              MS. LIVELY:  Sixty-five.
 5          Q.   BY MS. LIVELY:  Mr. Tran, the court
 6      reporter has handed you what's been marked as
 7      Exhibit 65, and I want you to look at the middle
 8      part because I realize it's in a format that you may
 9      not recognize.
10              But there appears to be an e-mail from you
11      to Peter LeDonne, sent on Friday, July 25th, 2014,
12      at 5:30 p.m.  Do you see that?
13          A.   Yes.
14          Q.   And do you have any reason to dispute that
15      that's an e-mail that you sent to Mr. LeDonne on
16      July 25th, 2014?
17          A.   May I read it?
18          Q.   Of course.
19          A.   Yes.
20          Q.   That's an e-mail that you sent to
21      Mr. LeDonne?
22          A.   Yes.
23          Q.   And were you truthful when you wrote that
24      in Exhibit 65?
25          A.   Possible, yes.
```



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 20 of 125

1        Q.    Is it possible that you were being

2    untruthful when you wrote that e-mail?

3        A.    I will say yes.

4        Q.    What would -- What would you have been

5    being untruthful about?

6        A.    I mean just -- yes.

7        Q.    I'm not sure what you're saying yes to.

8        A.    Is that what I wrote was help me -- help

9    me to improve the knowledge to communicate with the

10   customer, yes.

11       Q.    That was truthful?

12       A.    Yes.

13       Q.    And was it truthful where you said, "I can

14   see this training course, that very helpful and that

15   make me understand deeply how important to service

16   our customer in better way"?

17       A.    Yes.

18       Q.    And was it truthful that you appreciated

19   that Mr. LeDonne and Ms. Moreland had provided you

20   with the training?

21       A.    Yes.

22       Q.    Mr. Tran, are you aware of any other

23   HEMASS customer service agents who received

24   individualized training like you did on July 25th,

25   2014?

ESQUIRE
DEPOSITION SOLUTIONS

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 21 of 125

1      A.    Not that I recall.

2      Q.    Mr. Tran, can you think of a reason why,

3   if Mr. LeDonne wanted to get back at you for taking

4   family leave in June, he would take the time to

5   provide you with this individualized training that

6   you found helpful?

7           MS. STEPHENSON:   Objection.   Calls for

8   speculation.   Compound.

9           THE WITNESS:   I didn't understand the

10  question.   I'm sorry.

11     Q.    BY MS. LIVELY:   Pardon?

12     A.    I did not understand the question.   Can

13  you explain that for me, please.

14     Q.    Sure.   If Mr. LeDonne was hostile to you

15  because you took family leave, why would he take the

16  time out of his schedule to provide you this

17  individualized training?

18          MS. STEPHENSON:   Objection.   Calls for

19  speculation.   Assumes facts not in evidence.

20          THE WITNESS:   I'm not sure why Peter did

21  that.   I'm not sure why he provide it.

22     Q.    BY MS. LIVELY:   You don't know why he

23  provided it?

24     A.    I don't know why he provide it, yes.

25     Q.    Wouldn't you agree, Mr. Tran, that if

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 22 of 125

1    Wells Fargo is looking for a way to get rid of you,

2    they would have just had you not take the CCL class

3    and then become ineligible to work in the

4    department?

5              MS. STEPHENSON:  Objection.  Calls for

6    speculation.  Assumes facts not in evidence.  Calls

7    for a legal conclusion.

8              THE WITNESS:  I don't know how to answer

9    that question.

10        Q.   BY MS. LIVELY:  Well, in your head, does

11   it make sense that, if a company wants to get rid of

12   an employee, they would provide training that helps

13   that employee succeed?

14        A.   That -- Nothing I know of.

15        Q.   Okay.  Did it occur to you that

16   Mr. LeDonne provided you with the individualized

17   training to assist you in doing your job better?

18             MS. STEPHENSON:  Objection.  Assumes facts

19   not in evidence.

20             THE WITNESS:  I'm sorry.  Can you ask it

21   one more time, please.

22        Q.   BY MS. LIVELY:  Sure.  Did it occur to you

23   that Mr. LeDonne provided you with the

24   individualized training to help assist you in doing

25   your job better?



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

DUKE TRAN                                          May 19, 2017
TRAN vs WELLS FARGO BANK                                      85

1          A.    Just for coaching purposes.

2          Q.    Right.   To make you --

3                    (Reporter request.)

4          THE WITNESS:   For coaching purposes.

5          Q.   BY MS. LIVELY:   Coaching purposes?

6          A.   Yes.

7          Q.   And that would be to help you improve your

8    skills; correct?

9          A.    Possible, yes.

10         Q.    Did it occur to you that Ms. Thrush issued

11   you the memorandum of understanding to convey to you

12   the importance of attending the CCL training?

13         MS. STEPHENSON:   Objection.   Assumes facts

14   not in evidence.   Calls for speculation.

15         THE WITNESS:   I'm not sure what Kimberly

16   issued a memo.   I did not know what she did.

17         Q.   BY MS. LIVELY:   Well, was it clear to you,

18   after you received the memorandum of understanding,

19   that attendance at the CCL training was really

20   important?

21         A.    Possible, yes.

22         Q.    And did you understand, after receiving

23   the memorandum of understanding, that if you did not

24   attend the CCL training, you may become ineligible

25   for working as a customer service agent in HEMASS?



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 24 of 125

DUKE TRAN                                          May 19, 2017
TRAN vs WELLS FARGO BANK                                    86

```
 1          A.    I'm sorry.  Can you repeat it one more
 2     time.
 3          Q.    Sure.  After receiving the memorandum of
 4     understanding, did you realize that if you failed to
 5     attend the CCL training, you would become ineligible
 6     to work as a customer service agent in HEMASS?
 7          A.    Yes.
 8          Q.    Did Ms. Thrush tell you that?
 9          A.    Ms. Thrush was tolding me is, "If you're
10     missing a training class again, I will put you on
11     the leave of absence.  You have to go look for
12     another job."  She was threatening me in that time
13     in her office.
14          Q.    And do you have any reason to dispute that
15     she would not have had any alternative but to find
16     another job, if you didn't complete the mandatory
17     training?
18               MS. STEPHENSON:  Objection.  Calls for
19     speculation.
20               THE WITNESS:  That's all I know what she
21     told me.
22          Q.    BY MS. LIVELY:  But you don't have any
23     reason to think she was lying to you about that
24     statement, do you?
25          A.    I didn't know what she thinking.
```



DUKE TRAN                                        May 19, 2017
TRAN vs WELLS FARGO BANK                                    87

1           Q.   Did the July memorandum of understanding

2    reduce your rate of pay?

3           A.   I'm sorry.  I didn't hear the question.

4           Q.   Did the July memorandum of understanding

5    cause you to have a reduced rate of pay?

6           A.   You mean reduce in my pay rate?

7           Q.   Correct.

8           A.   No.

9           Q.   Did the July memorandum of understanding

10   decrease the number of hours that you worked each

11   week at Wells Fargo?

12          A.   No, ma'am.

13          Q.   Did the July memorandum of understanding

14   alter the benefits that you were eligible for or

15   received at Wells Fargo?

16          A.   That, not that I recall.

17          Q.   Did the July memorandum of understanding

18   significantly alter your job duties as a customer

19   service agent?

20          A.   Possible, yes.

21          Q.   How did it significantly alter your job

22   duties as a customer service agent?

23          A.   For better improvement to -- for customer

24   service.

25          Q.   Oh, okay.  I'm asking something a little



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1   different.

2           I'm asking if you had different job duties

3   after the memorandum of understanding than you did

4   before, or did you essentially have the same job

5   duties?

6       A.   The same job duty, yes.

7       Q.   Okay.

8       A.   I'm sorry.  I didn't understand your

9   question.

10      Q.   That's all right.  I figured that.

11          And did the memorandum of understanding

12  make you ineligible for transfer to another

13  department?

14          MS. STEPHENSON:  Objection.  Calls for

15  speculation.

16          THE WITNESS:  I did not understand the

17  question.  I'm sorry.

18      Q.   BY MS. LIVELY:  Sure.  And, again, if you

19  don't know, it's okay to say you don't know.

20          Did receiving the memorandum of

21  understanding make you ineligible for transfer to

22  another department?

23          MS. STEPHENSON:  Calls for speculation.

24          THE WITNESS:  Not that I recall.

25      Q.   BY MS. LIVELY:  Did anyone ever tell you



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 27 of 125

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1  that the memorandum of understanding was issued to

2  you because you took Oregon family leave?

3      A.   I'm sorry.  Could you say that one more

4  time.

5      Q.   Sure.  Did anyone at Wells Fargo ever tell

6  you that the reason they issued you the memorandum

7  of understanding was because you had taken Oregon

8  family leave?

9      A.   Yes.

10     Q.   Who told you that?

11     A.   Peter.

12     Q.   What did Peter say?

13     A.   Peter said, "The next training class in

14  September.  If you not attend with the memo we

15  issue, you will get terminated."

16     Q.   Okay.  That's -- That's different than the

17  question I asked.

18     A.   Oh, I'm sorry.

19     Q.   It's okay.  The question I asked was:  Did

20  somebody say, "The reason we are giving you" -- or

21  something to this effect -- "The reason we're giving

22  you the memorandum of understanding is because you

23  took leave under the Oregon Family Leave Act"?

24     A.   That something I did not remember.

25     Q.   Okay.  Do you have any information,



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 28 of 125

1    Mr. Tran, that Wells Fargo would not have issued you

2    the memorandum of understanding if you had missed

3    the June CCL training but for a non Oregon family

4    leave reason?

5         A.   I still did not understand that question.

6    I'm sorry, Counsel.

7         Q.   It's okay.  So let's say that you had

8    missed the June CCL training because you went on

9    vacation.  Right?

10        A.   Yes.

11        Q.   But you missed it because it was a

12   vacation.

13             Do you have any information that Wells

14   Fargo would have refrained, would have not given you

15   the memorandum of understanding in those

16   circumstances?

17        A.   I did not know.

18        Q.   At the time the memorandum of

19   understanding was delivered to you by Ms. Thrush,

20   was anyone else present?

21        A.   Only Kimberly.

22        Q.   And where -- where were you when she gave

23   it to you?

24        A.   In her office.

25        Q.   Is that a closed-door office or a cubicle?



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1        A.    It's a big cubicle.

2        Q.    Do you know whether anyone -- did anyone

3    ever tell you that they overheard that conversation?

4        A.    No one tell me.

5        Q.    When Ms. Thrush gave you the July

6    memorandum of understanding, did she say anything

7    negative about you having -- you having taken Oregon

8    family leave?

9        A.    That, I did not remember.

10        Q.    When the July memorandum of understanding

11    was given to you, did Ms. Thrush say anything

12    negative about your child having been sick in June?

13        A.    That something I did not recall.

14        Q.    When Ms. Thrush gave you the memorandum of

15    understanding, did she mention anything about you

16    being Asian?

17        A.    No.

18        Q.    When Ms. Thrush gave you the memorandum of

19    understanding, did she say anything about your

20    accent?

21        A.    No.

22        Q.    Did Kimberly Thrush ever try to discourage

23    you from taking family leave?

24        A.    I did not recall that.

25        Q.    Did you ever apply for any family leave



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                      Page 30 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
92

1      under the Oregon Family Leave Act, that was denied

2      to you?

3          A.   No.

4          Q.   Did anyone in management at Wells Fargo

5      ever tell you that it was inappropriate for you to

6      take Oregon family leave?

7          A.   Not that I recall.  I don't remember.

8          Q.   Were you aware of other agents on

9      Ms. Thrush's team who had taken Oregon family leave?

10         A.   That, I do not know of.

11         Q.   Do you remember telling Mr. LeDonne that

12     Heather Stone was allowed to take leave when her

13     child had pink eye?

14         A.   No.

15         Q.   Did anyone in management at Wells Fargo

16     ever tell you that you could be fired for taking --

17     taking Oregon family leave?

18         A.   That something I did not remember.

19         Q.   Do you have any information that

20     Ms. Thrush or Mr. LeDonne took a negative action

21     against Ms. Stone because she took Oregon family

22     leave?

23         A.   I did not know Heather Stone took -- take

24     medical leave.  I did not know.

25         Q.   Do you have any information that



800.211.DEPO (3376)
*EsquireSolutions.com*

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 31 of 125

1    Ms. Thrush or Mr. LeDonne took any negative action

2    against you because you took Oregon family leave?

3        A.   I did not recall that.

4        Q.   Did you refuse to sign the memorandum of

5    understanding?

6        A.   Yes.

7        Q.   Why did you refuse to sign it?

8        A.   She did not ask me to sign.  She said, "I

9    want you to read it and I want you to put your

10   initial on it."  And I said, "No, I don't have to

11   sign on this."

12       Q.   Why did you not want to put your initial

13   on it?

14       A.   Because I don't feel comfortable putting

15   my initials on it.

16       Q.   Looking at Exhibit 64, today, is there

17   anything contained within Exhibit 64 that you

18   believe is untrue or inaccurate?  And you can take

19   your time to read it again.

20       A.   No, I don't believe that the training

21   class is in July; it is in June.

22            Well, she wrote the date July 11, but

23   she's stating on the written of July 21st.  We don't

24   have no training class in July; it was in June.  So

25   this is not correct.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of              EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 32 of 125

1      Q.   Well, which sentence are you looking at?

2      A.   She says the date is July 11th, she wrote;

3  but here she said:  "Your team leadership during

4  week of July 21st, 2014."

5      Q.   Oh.  See, that sentence says:  "An

6  individual review of the CCL model will take place

7  with your team leadership during the week of July

8  21st, 2014."  Correct?

9      A.   Yes, what she wrote; but I did not know

10  what she mean by that.

11      Q.   Okay.  But we already discussed that you

12  did have an individual review with Mr. LeDonne and

13  Ms. Moreland on July 25th; correct?

14      A.   Yes.

15      Q.   Okay.  So, aside from that that we just

16  talked about, is there anything that you believe is

17  incorrect or inaccurate in Exhibit 64, the

18  memorandum of understanding?

19      A.   Yes.

20      Q.   What else is inaccurate?

21      A.   No, I agree with it.  Yes.

22      Q.   Okay.  Maybe I should ask it a better way.

23  I'll go ahead and ask it.  How do I not ask it as a

24  negative?

25           Do you agree that the statements contained



DUKE TRAN                                              May 19, 2017
TRAN vs WELLS FARGO BANK                                       95

1   within Exhibit 64, the memorandum of understanding,

2   are accurate?

3           A.   Yes, I agree.

4           Q.   Okay.   Do you have any information that

5   Wells Fargo considered your report of unlawful

6   activity with regard to concealing lost loan

7   documents as a factor in its decision to issue the

8   July memorandum of understanding?

9           MS. STEPHENSON:   Objection.   Calls for a

10  legal conclusion.   Calls for speculation.

11          THE WITNESS:   I'm sorry.   I -- Can you

12  explain the question.

13          MS. LIVELY:   Sure.

14          THE WITNESS:   It's a long question.

15          Q.   BY MS. LIVELY:   Sure.   Do you believe that

16  you were issued that memorandum of understanding

17  because you reported what you believed to be

18  unlawful activity with regard to concealing lost

19  loan documents?

20          MS. STEPHENSON:   Objection.   Calls for

21  legal conclusion.

22          Q.   BY MS. LIVELY:   Go ahead.

23          A.   I'm confused a lot with what you're

24  saying, the question.

25          Q.   Well, in this lawsuit, you have a claim



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1      that Wells Fargo retaliated against you because you

2      reported what you believed to be unlawful conduct

3      with regard to lost loan documents.

4                Do you understand that?  Do you understand

5      that you have that claim?

6          A.   My lawyer write that claim.  I did not

7      remember.  I'm sorry.

8          Q.   Well, do you understand that that's one of

9      your claims?

10         A.   Yes.

11         Q.   Okay.  So I'm entitled to find out what

12     you think, what negative things, in what ways you

13     think Wells Fargo retaliated against you for making

14     that report.  Okay?  I get to find out what you

15     think Wells Fargo did in retaliation "to get back at

16     you," in regular English, for making that report.

17     And what I'm trying to find out is whether you think

18     that the memorandum of understanding was one of the

19     things that Wells Fargo did to get back at you for

20     making that report.

21         A.   That was a possible, yes.

22         Q.   Okay.  What do you base that on?

23         A.   Based on the e-mail in April 29, and I

24     would talk to Peter.  I do not agree with that

25     e-mail tell me to deceive the customer and lying.

```
 1    We discussed with Peter about that and I asked him,
 2    "Why did you talk at to send that e-mail?"  He said
 3    -- He told me it came from up management.
 4         Q.   What I'm trying to find out is if you have
 5    any information that ties your receiving the
 6    memorandum of understanding to that report.
 7              Did somebody tell you that you were being
 8    issued the memorandum of understanding because you
 9    made the report of unlawful activity?
10              MS. STEPHENSON:  Objection.  Compound.
11              THE WITNESS:  I still did not understand
12    that question.  I'm sorry.
13         Q.   BY MS. LIVELY:  Did -- Mr. Tran, did
14    anyone ever tell you that the reason that you were
15    receiving the memorandum of understanding was
16    because you'd made a report of unlawful activity?
17         A.   No, did not.
18         Q.   Do you have any evidence to support the
19    fact that you received the memorandum of
20    understanding because you reported unlawful
21    activity?
22              MS. STEPHENSON:  Objection.  Calls for a
23    legal conclusion.
24              THE WITNESS:  I still did not understand
25    the question.
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                  Page 36 of 125

1    that question.

2         Q.   BY MS. LIVELY:  Well, do you have any

3    other information, other than the fact that you made

4    a report of unlawful activity, that ties the

5    memorandum of understanding to that report?

6              MS. STEPHENSON:  Objection.  Calls for a

7    legal conclusion.

8              THE WITNESS:  I still do not understand

9    the question.  I'm sorry.

10        Q.   BY MS. LIVELY:  Other than the fact that

11   you made a report of what you believed to be

12   unlawful activity, do you have any information that

13   the memorandum of understanding was related to that

14   report of unlawful activity?

15             MS. STEPHENSON:  Objection.  Calls for a

16   legal conclusion.

17             THE WITNESS:  I still don't know how to

18   answer that question.

19        Q.   BY MS. LIVELY:  Well, nobody told you that

20   the memorandum was based on your report of unlawful

21   activity; correct?

22        A.   Yes.

23        Q.   Did you ever see any documents that

24   suggested that the memorandum of understanding was

25   based on your report of unlawful activity?



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                     Page 37 of 125

1          A.    No.

2          Q.    Did you ever hear any colleagues or

3    co-workers saying that they knew that the memorandum

4    of understanding had been issued to you because

5    you'd made a report of illegal activity?

6          A.    Not that I recall.

7                MS. LIVELY:  All right.  Why don't we go

8    ahead and go off the record.

9                THE VIDEOGRAPHER:  Going off the record.

10   This marks the end of disk 1.  The time is 11:16

11   a.m.

12                    (Recess.)

13                THE VIDEOGRAPHER:  Going back on the

14   record.  This marks the beginning of media 2.  The

15   time is 11:26 a.m.

16         Q.    BY MS. LIVELY:  Mr. Tran, we are back on

17   the record in your deposition.

18                Do you realize that you are still under

19   oath?

20         A.    Yes, ma'am.

21         Q.    And, following the break, do you have any

22   testimony that you would like to add to or modify?

23         A.    No, ma'am.

24         Q.    During the time that you worked for Wells

25   Fargo, did you understand that the company had a

 1   team member handbook that applied to you?

 2        A.   Yes.

 3             MS. LIVELY:  All right.

 4                  (Exhibit 66 marked.)

 5        Q.   BY MS. LIVELY:  Mr. Tran, the court

 6   reporter has handed you what's been marked as

 7   Exhibit 66, which is a document entitled "Wells

 8   Fargo team member handbook," with a date of January

 9   2014.

10             Do you see that?

11        A.   Yes.

12        Q.   And do you recognize this as the handbook

13   that Wells Fargo had in place as of January 2014?

14        A.   Yes.

15                  (Exhibit 67 marked.)

16             THE WITNESS:  Thank you.

17        Q.   BY MS. LIVELY:  Mr. Tran, the court

18   reporter has handed you what's been marked as

19   Exhibit 67, which is a document entitled "team

20   member acknowledgment" and appears to be signed by

21   you on February 16th, 2004.

22        A.   Yes.  May I read it?

23        Q.   Yes.

24        A.   Yes.

25        Q.   Do you recognize Exhibit 67, Mr. Tran?



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                   Page 39 of 125

```
 1        A.   Yes.
 2        Q.   And is that your signature above where it
 3   states "team member signature"?
 4        A.   Yes, ma'am.
 5        Q.   And did you sign Exhibit 67 on February
 6   16th, 2004?
 7        A.   Yes, ma'am.
 8        Q.   And did you read Exhibit 67 before you
 9   signed it?
10        A.   Yes, I did.
11        Q.   And the first bullet point towards the top
12   of Exhibit 66, there's a paragraph that states:  "I
13   have received or understand I will be provided the
14   handbook for Wells Fargo team members in hard copy
15   and/or be shown how to find it online," period.  "I
16   understand that the policies it contains do not
17   constitute an expressed or implied contract of
18   employment and that employment is at-will," period.
19   "I further understand that this" -- "that it is my
20   responsibility to read the handbook thoroughly and
21   become familiar with its content," period.
22             Did I read that correctly, Mr. Tran?
23        A.   Yes, ma'am.
24        Q.   After being hired by Wells Fargo, did you
25   read the handbook thoroughly and become familiar
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 40 of 125

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1          THE VIDEOGRAPHER:  Counselor.

2          MS. LIVELY:  Christina.

3          THE VIDEOGRAPHER:  Do you have your mike

4    on?  Oh.

5      Q.   BY MS. LIVELY:  This page is entitled

6    "serve Wells Fargo's best interests"; correct?

7      A.   Yes.

8      Q.   And the very last sentence on that page

9    states:  "If you become aware of any violations or

10   potential violations of this code of applicable

11   laws, rules, or regulations, or of accounting

12   standards or controls, you must promptly report such

13   activity as described in the ethics line section of

14   this code."

15         Did I read that correctly?

16     A.   Yes, ma'am.

17     Q.   Mr. Tran, did you ever report any concerns

18   regarding lost loan documents to Wells Fargo's

19   ethics line?

20     A.   No, ma'am.

21     Q.   Why not?

22     A.   I did not read the handbook.  I did not

23   know where to go.

24     Q.   In fact, you never reported a possible

25   violation of law, rule, or regulation with regard to



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 41 of 125

1   missing customer loan documents to anyone outside of

2   Peter LeDonne, did you?

3           MS. STEPHENSON:  Objection.  Calls for a

4   legal conclusion.

5           THE WITNESS:  I'm sorry.  Say it one more

6   time, please.

7       Q.   BY MS. LIVELY:  Yeah.  You never reported

8   a possible violation of law, rule, or regulation

9   with regard to missing customer loan documents to

10  anyone other than Peter LeDonne, did you?

11          MS. STEPHENSON:  Objection.  Calls for a

12  legal conclusion.  Assumes facts not in evidence.

13          THE WITNESS:  This I did not remember.

14      Q.   BY MS. LIVELY:  Mr. Tran, I will represent

15  to you for purposes of this deposition that we have

16  records of 28 separate e-mails that you sent to

17  human resources representatives and at least six

18  telephone meetings from the last six months of your

19  employment with Wells Fargo, and in not one of them

20  do you raise the issue of concealing customer loan

21  documents.

22          MS. STEPHENSON:  Objection.  Assumes facts

23  not in evidence.  Calls for speculation.  Calls for

24  a legal conclusion.

25      Q.   BY MS. LIVELY:  Do you have any

1    information to dispute that?

2         A.   I did not remember.  It's been for a

3    while, for a long time.

4         Q.   Can you tell me why, Mr. Tran, if you

5    thought Wells Fargo was retaliating against you or

6    reporting unlawful conduct with regard to missing

7    loan documents, you did not raise that issue once in

8    those 34 interactions with human resources that you

9    had?

10             MS. STEPHENSON:   Objection.  Calls for

11   legal conclusion.  Calls -- or assumes facts not in

12   evidence.

13             THE WITNESS:   It's been for a long time.

14   I did not remember.

15        Q.   BY MS. LIVELY:   Isn't the reason that you

16   did not raise the issue of missing customer loan

17   documents as a basis for retaliation because you did

18   not believe that to be the case when you worked for

19   Wells Fargo?

20             MS. STEPHENSON:   Objection.  Calls for a

21   legal conclusion.  Assumes facts not in evidence.

22        Q.   BY MS. LIVELY:   Go ahead.

23        A.   Yeah, I did not recall it at the time.

24        Q.   What do you mean, you didn't recall at the

25   time?



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 43 of 125

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

DUKE TRAN                                                    May 19, 2017
TRAN vs WELLS FARGO BANK                                           115

 1         A.   I did not remember.  It's been for a
 2    while.
 3         Q.   Wouldn't you agree, Mr. Tran, that if you
 4    thought Wells Fargo were retaliating against you for
 5    reporting unlawful conduct with regard to the
 6    missing customer loan documents, you would have told
 7    somebody at HR about that?
 8              MS. STEPHENSON:  Objection calls for
 9    speculation.  Calls for a legal conclusion.  Assumes
10    facts not in evidence.
11         Q.   BY MS. LIVELY:  Go ahead.
12         A.   Yeah, I did not remember.  I would discuss
13    with Peter in the management.
14         Q.   Well, I understand that, Mr. Tran.
15              But wouldn't you agree that you talked to
16    human resources several times in 2014 about
17    complaints that you were having with your
18    management?  Would you agree with that?
19         A.   Yeah, Peter and Kim told me and Alan Rose,
20    I would discuss about the issue in the e-mail, and
21    they told me, "This is handled by the senior
22    management.  It's not your concerns."  So he told me
23    to do what?  "Follow your management direction."
24         Q.   Okay.  And I need you to listen to my
25    question and not answer the question that you want

Declaration of Leah C. Lively in Support of           EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 44 of 125

```
 1              MS. LIVELY:  Yes.
 2              THE WITNESS:  Thank you.
 3        Q.   BY MS. LIVELY:  As you sit here today, do
 4   you have any recollection of telling anyone in human
 5   resources that you thought you were being retaliated
 6   against because you had reported unlawful activity
 7   with regard to missing loan documents?
 8              MS. STEPHENSON:  Objection.  Calls for
 9   legal conclusion.
10              THE WITNESS:  I did not remember.  I'm
11   sorry.
12        Q.   BY MS. LIVELY:  That's okay.
13              So you're saying you don't remember
14   whether you reported something to human resources
15   about unlawful activity with regard to missing loan
16   documents.  Is that your testimony?
17        A.   I did not remember, yes.
18        Q.   Do you have any information -- Strike
19   that.
20              As you sit here today, do you have a
21   recollection of complaining to Alan Rose about the
22   issue related to missing customer loan documents?
23        A.   Yes.
24        Q.   What do you recall about that?
25        A.   I was e-mail Alan, got the permission to
```



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 45 of 125

DUKE TRAN                                          May 19, 2017
TRAN vs WELLS FARGO BANK                                      118

 1    talk to Alan.  And his secretary e-mail me back, set
 2    up the time.  I don't remember exactly what time.  I
 3    talked to Alan for a few time.  I brought my concern
 4    what happened, how Peter treated me.  I would
 5    mention about CMP and I would mention about e-mail
 6    and I said, "I do not agree, the company tell me to
 7    deceive the customer and lie to the customer."  And
 8    Alan said, "This is something, it not your concern.
 9    So we handle it."
10        Q.   So it's your testimony that you complained
11    to Alan Rose that the company was deceiving
12    customers and lying to the customers?
13        A.   Based on the e-mail that was sent out,
14    yes.
15        Q.   That's on an e-mail that he sent out?
16        A.   I think Carl or Peter sent it out.  I
17    asked Peter, and Peter said it came from the senior
18    management.
19        Q.   Okay.  I'm trying to get this straight.
20             Are you testifying that you told Alan Rose
21    that Wells Fargo was deceiving and lying to its
22    customers?
23        A.   Yes, in his office.
24        Q.   Okay.  When did you tell him that?
25        A.   I don't remember, but in his office.



Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 46 of 125

1      Q.    Was anyone else present?

2      A.    Only me and Alan.

3      Q.    And was Alan angry with you when you told

4   him that?

5      A.    No.

6      Q.    Did you get along with Alan?

7      A.    We don't talk much, because he's a senior

8   management.

9      Q.    Do you have any reason to believe that

10  Alan is not a truthful person?

11     A.    It's possible, yes.

12     Q.    Based on what?

13     A.    Based on what he told me.  I was brought

14  my concern to Alan about the e-mail, the phone call

15  I took from the customer.  I would mention about a

16  document, and he told me this is something I should

17  not concern.  He said, "Put that on the side," yes,

18  and he said, "Focus on your job."

19          I would mention where Peter was harassing

20  me, he threatened me, yelling; and he said he would

21  talk to Peter in his office at that time.

22     Q.    How does that make Alan not a truthful

23  person?

24     A.    He said, when he come back from vacation,

25  because he took a vacation, then he will discuss

Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 47 of 125

1         A.    Yes.

2         Q.    That's your handwriting; correct?

3         A.    Yes.

4         Q.    Why were you dating this note?

5         A.    I'm not sure.  I don't remember.  This is

6    2014.  Yeah, I did not remember.

7         Q.    Did you white out the date that the doctor

8    had originally put on the note?

9         A.    No date on this -- on this document.

10        Q.    You're saying that there was never a date

11   on this document?

12        A.    Yeah, I don't see any date.

13        Q.    Did the doctor give you this document on

14   06/26/2014?

15        A.    I do not remember.  This has been for a

16   while.

17        Q.    Is there anything that would help you

18   recall what day the doctor gave you this document?

19        A.    I did not remember.  Yeah, I don't

20   remember what days are.

21               (Exhibit 71 marked.)

22        Q.    BY MS. LIVELY:  Mr. Tran, the court

23   reporter has handed you what's been marked as

24   Exhibit 71, which appears to be a series of e-mails

25   between you and Glenda Longren on September 12th,



Declaration of Leah C. Lively in Support of                   EXHIBIT 3
Defendant's Motion for Summary Judgment                    Page 48 of 125

DUKE TRAN                                          May 19, 2017
TRAN vs WELLS FARGO BANK                                    146

 1    2014.

 2         A.   Yes.

 3         Q.   Do you recognize these e-mails?

 4         A.   Yes, I did.

 5         Q.   Okay.  And if you look at the e-mail on

 6    the top, the most recent one from Ms. Longren to

 7    you, dated September 12th, 2014, in the large

 8    paragraph there, Ms. Longren states:  "Your

 9    attendance was not impacted by your missed days."

10              Do you see that?

11         A.   Yes.  That in the e-mail.

12         Q.   Does that refresh your recollection that

13    Ms. Longren told you that missing June 26th and 27th

14    was not counted against you?

15         A.   She has (indiscernible) to show it to me.

16         Q.   And then in the second sentence, she says:

17    "This memo is also not part of the corrective action

18    process."

19              Do you see that?

20         A.   Yes.

21         Q.   And do you understand that Ms. Longren was

22    telling you that the memorandum of understanding was

23    not part of the corrective action process?

24         A.   I read e-mail, but I'm not sure I

25    understand at that time.



Declaration of Leah C. Lively in Support of              EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 49 of 125

1       Q.    Did you ask her for clarification?

2       A.    No, I did not.

3       Q.    Do you have any basis to dispute

4    Ms. Longren's statement that the memorandum of

5    understanding was not part of the correction --

6    corrective action process?

7       A.    That what she wrote in e-mail.

8       Q.    Right.  Do you have any basis to dispute

9    that?

10       A.    I'm sorry.  Say one more time.

11       Q.    Do you have any basis to dispute that

12    Ms. Longren is telling you the truth here?

13       A.    No, I did not dispute it.

14       Q.    And go ahead and read through the e-mail

15    that you sent -- not out loud; to yourself -- the

16    e-mail that you sent to Ms. Longren on September

17    12th, 2014, at 11:45 a.m.

18       A.    At 11:45?

19       Q.    Uh-huh.  The middle one.

20       A.    "Good morning."

21       Q.    No, you don't need to read it out loud --

22       A.    Oh, I'm sorry.

23       Q.    -- Mr. Tran.  I'm just saying to review it

24    because I want to ask you a question about it.

25       A.    Oh, just review it?



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                  Page 50 of 125

1  Ms. Longren on August 27th, 2014, at 1:56 p.m.  Do

2  you see that?

3       A.   Yes.

4       Q.   And did you attempt to be honest and

5  accurate in sending this e-mail to Ms. Longren?

6       A.   May I have to read it?

7       Q.   Yes.

8       A.   Yes.  That exactly Peter said in the

9  conference room.

10       Q.   What you're -- What you're telling Glenda

11  is what Peter said in the conference room?

12       A.   That what Peter told me, yes.

13       Q.   Okay.  But you -- And would you agree that

14  the e-mail that you sent to Glenda on August 27th

15  was sent when these events were fresh in your mind?

16       A.   I'm sorry.  Are you talking about this

17  e-mail or...

18       Q.   Yeah.  I'm just saying, did you make the

19  e-mail when the events you're discussing are fresh

20  in your mind?

21       A.   Yes.

22       Q.   Okay.  In the second paragraph, you write:

23  "I explain to Peter that the FTO checklist from the

24  CMP monitor, it change every month.  That make is

25  very difficulties to remember everything."



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 51 of 125

 1             Was that a true statement?

 2         A.    It is.

 3         Q.    Did you feel like it was difficult to

 4    remember everything?

 5         A.    Yeah, this has been for a while.  I did

 6    not recall this.

 7         Q.    Well, do you recall having difficulty,

 8    when you were a HEMASS agent, keeping up with

 9    remembering everything because the checklist changed

10    regularly?

11         A.    The checklist, it changing regularly, yes.

12         Q.    And do you recall having difficulty

13    keeping up with those changes, like you said here in

14    Exhibit 75?

15         A.    It's possible, yes.

16         Q.    And then the next sentence says:  "I bring

17    my concern to Peter every month when I have call

18    coaching."

19             Was that an accurate statement?  Did you

20    have call coaching with Peter every month?

21         A.    Yes.

22         Q.    And then if you go down to the next

23    paragraph, the next big paragraph, the second

24    sentence says:  "Peter also ask me that you have an

25    Asian accent that is very difficult for you to talk



Declaration of Leah C. Lively in Support of              EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 52 of 125

DUKE TRAN                                    May 19, 2017
TRAN vs WELLS FARGO BANK                             159

1  time I didn't tell her.

2      Q.   BY MS. LIVELY:  Is the reason that you

3  didn't tell her is because it didn't happen?

4          MS. STEPHENSON:  Objection.

5  Argumentative.

6          THE WITNESS:  It is happen.

7      Q.   BY MS. LIVELY:  But you just chose not to

8  tell human resources.  Is that your testimony?

9      A.   Possible, yes.

10         MS. STEPHENSON:  Objection.  Assumes facts

11  not in evidence.

12     Q.   BY MS. LIVELY:  All right.  If you go on

13  to the next sentence, it says:  "Peter ask me, do

14  you want to look for another job without being on

15  the phone?  I told Peter that I love my job here in

16  this department and I enjoyed to help our customer

17  with our home equity service.  I am sure this is

18  discrimination and retaliation I got from Peter and

19  possible from the up manager because I misses two

20  days of training class for customer loyalty course

21  to stay home and take care of my illness child."

22         So you're telling -- In that sentence,

23  you're telling Ms. Longren that you are sure Peter

24  is retaliating against you because you missed the

25  CCL training; correct?



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1        A.    Yes.

2        Q.    Not because you reported concealing lost

3    documents from customers; correct?

4        A.    For this point in time, yes.

5        Q.    If you thought Peter was retaliating

6    against you for concealing lost documents, why

7    didn't you say that to Ms. Longren on August 27th

8    when you were making your other complaints?

9        MS. STEPHENSON:    Objection.    Calls for

10   speculation.

11       THE WITNESS:    Alan instructed me I

12   shouldn't say anything to the human resources

13   because wasting time and money for the company.

14       Q.    BY MS. LIVELY:    But you hadn't met

15   Mr. Rose at the time that you prepared Exhibit 75.

16   That was the next day.

17       A.    Yeah.    This e-mail is a different issue,

18   though.

19       Q.    Well, so would it be fair, then, to say

20   that you didn't think that what's being addressed

21   here, the CMP result, was a result of you reporting

22   unlawful conduct with regard to concealed customer

23   documents?

24       MS. STEPHENSON:    Objection.    Calls for

25   legal conclusion.

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1  Vietnamese?  Do you not know whether your race is

2  Vietnamese?

3         A.    I am Vietnamese.

4         Q.    Are you aware that Peter LeDonne is half

5  Asian?

6         A.    I did not know.

7         Q.    Knowing that Mr. LeDonne is half Asian,

8  can you think of any reason why he would want to

9  discriminate against other people who are Asian?

10        MS. STEPHENSON:  Objection.  Calls for

11  speculation.

12        THE WITNESS:  I did not know.

13        Q.    BY MS. LIVELY:  Who at Wells Fargo do you

14  claim discriminated against you because of your race

15  or national origin?

16        A.    Can you repeat that question one more

17  time, please.

18        Q.    Who at Wells Fargo do you claim

19  discriminated -- discriminated against you because

20  of your race or national origin?

21        A.    I'm not sure about that, but I know I was

22  complain Peter would tell me I have an Asian accent.

23        Q.    Okay.  Did anyone other than Peter LeDonne

24  make any comments to you, that you felt were

25  negative with regard to being Asian or Vietnamese?



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 55 of 125

DUKE TRAN                                              May 19, 2017
TRAN vs WELLS FARGO BANK                                       164

1          A.    It not that I know of.

2          Q.    I would like you to tell me each comment

3    that Mr. LeDonne made, that you think was negative

4    with regard to your race or national origin; and,

5    like a shopping list, I want to go through each one

6    that you remember him making.

7               I don't care if it's in order, but what do

8    you remember Mr. LeDonne saying, that you thought

9    was negative based on your race or national origin?

10          A.    Mr. LeDonne always say I'm Asian -- "You

11   have a damn Asian accent."   That the only thing I

12   know of.

13          Q.    "A damn Asian accent"?

14          A.    Yes.

15          Q.    And how many times did he say it?

16          A.    Only one.

17          Q.    And do you remember what -- what the

18   situation was that he said that, like what was going

19   on?

20          A.    I didn't remember at this point.

21          Q.    Is there anything that you could look at

22   that would help you remember what was going on when

23   he said that?

24          A.    And he would get angry, but I did not

25   recall what exactly what it is.



Declaration of Leah C. Lively in Support of                   EXHIBIT 3
Defendant's Motion for Summary Judgment                  Page 56 of 125

1          Q.    When -- When Mr. LeDonne would get angry,

2   how did you know he was angry?

3          A.    His eye -- His eye getting really big.

4          Q.    His eyes?

5          A.    His eyeball, yeah.

6          Q.    Okay.

7          A.    And face.

8          Q.    Did you tell Mr. LeDonne he looked like

9   Lionel Richie?

10         A.    I don't remember.

11         Q.    Other than the one time where Mr. LeDonne

12   referenced "your damn Asian accent," were there any

13   other comments that he made, that you thought were

14   negative with regard to your race or national

15   origin?

16         A.    That's only one time he would -- he was

17   saying, only that one time.

18         Q.    Okay.  This is my only chance to get to

19   ask you questions.

20         A.    Okay.

21         Q.    So I just want to make sure that I have

22   everything -- everything that Mr. LeDonne said, that

23   you believed was improper or negative that he said

24   to you about your national origin.

25              I have the "damn Asian accent" that he



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                   Page 57 of 125

1    said one time.  Is there anything else that he said?

2         A.   No.

3         Q.   Do you know whether there were any other

4    HEMASS customer service agents who were Asian?

5         A.   I did not recall.

6         Q.   And do you claim that Wells Fargo took any

7    negative actions against you because of your race or

8    national origin?

9         A.   Possible, yes.

10        Q.   Okay.  What negative actions do you think

11   Wells Fargo took against you because of your race or

12   national origin?

13        A.   Peter told me that I have "the damn Asian

14   accent," just mean, "You are" -- he mean like -- and

15   he's the management, he's leadership; and he would

16   get angry, yelling, and he make his point really

17   clear:  "You have a damn Asian accent."  That mean

18   my original nationality is Vietnamese.  That meant

19   he make me feel that is a discrimination against my

20   origin or where I came from.

21        Q.   Okay.  Other than Mr. LeDonne getting

22   angry and yelling and referring to "your damn Asian

23   accent," did Mr. LeDonne or anyone at Wells Fargo

24   take any actions against you as an employee that you

25   thought were based on your race or national origin?


E S Q U I R E
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of            EXHIBIT 3
Defendant's Motion for Summary Judgment                Page 58 of 125

1        A.   I don't understand the question.  Can you

2    explain it.

3        Q.   Well, do you think Wells Fargo -- anyone

4    at Wells Fargo did something bad to you, took some

5    action, some negative action against you, because of

6    your race or national origin?

7             MS. STEPHENSON:  Objection.  Calls for

8    speculation.

9             THE WITNESS:  That something I do not know

10   what people thinking.  I'm sorry.

11       Q.   BY MS. LIVELY:  Well, you're the one who

12   has a claim in this lawsuit for race discrimination,

13   so I'm entitled to find out from you how you think

14   you were discriminated against because of your race.

15   So that's what I'm trying to find out.  Okay?

16            What -- What things did Wells Fargo do to

17   you, what negative things did Wells Fargo do to you,

18   that you think happened because of your race or

19   national origin, other than Peter getting angry at

20   you and saying you have a "damn Asian accent"?

21   Anything else?

22       A.   Anything else, I do not recall.

23       Q.   Is there anything that you could look at

24   that would help you recall?

25       A.   That something I do not know.

Declaration of Leah C. Lively in Support of        EXHIBIT 3
Defendant's Motion for Summary Judgment            Page 59 of 125

1      Q.   So if, at trial, you get asked to testify,

2   "Mr. Tran, how did Wells Fargo discriminate against

3   you based upon your race?" what are you going to

4   say?

5           MS. STEPHENSON:   Objection.  Calls for

6   speculation.

7      Q.   BY MS. LIVELY:  Go ahead.

8      A.   I will say, based on what Peter told me,

9   "You have a damn Asian accent," that is meaning I

10  came from -- "You are Vietnamese.  You have your

11  damn accent.  I couldn't understand you."

12     Q.   Anything else?

13     A.   (Indiscernible.)

14     Q.   Did you ever hear Mr. LeDonne make any

15  negative comments about Asians or people from

16  Vietnam, that were directed at somebody other than

17  you?

18     A.   Not that I recall.

19     Q.   Did anyone, maybe one of your co-workers,

20  tell you that they heard Mr. LeDonne make negative

21  comments about Asians or Vietnamese people?

22     A.   I did not recall that.

23     Q.   Is there anything that you could look at

24  that would help you recall that?

25     A.   Yeah, I do not know.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1      Q.   Did anyone at Wells Fargo mention your

2   national origin or being Vietnamese, in connection

3   with issuing you the July memorandum of

4   understanding?

5      A.   That, I did not remember.

6      Q.   Is there anything that would help you

7   remember?

8      A.   I did not remember, not at the time.

9      Q.   Was your Asian accent discussed at all in

10   connection with the memorandum of understanding?

11      A.   That something I did not recall.

12      Q.   Did anyone ever tell you that your

13   national origin or race was a factor that Wells

14   Fargo considered in deciding to issue you the

15   memorandum of understanding?

16      A.   Can you repeat the question again,

17   Counsel.

18      Q.   Sure.  Did anyone ever tell you that your

19   race or national origin was a factor that Wells

20   Fargo considered in issuing you the memorandum of

21   understanding?

22      A.   That's -- I did not recall that.

23      Q.   And is there anything that you could look

24   at that would help you recall?

25      A.   I don't remember.



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                        Page 61 of 125

1    Q.   Do you have any information, from any

2  source, that your national origin or race was a

3  factor that Wells Fargo considered in issuing your

4  memorandum of understanding?

5    A.   Can you repeat it one more time.  I'm

6  sorry.

7    Q.   It's okay.  Do you have any information,

8  from any source, that your national origin or race

9  was a factor that Wells Fargo considered in issuing

10  you the memorandum of understanding?

11    A.   That, I did not know.

12    Q.   I'm sorry.  What did you say?

13    A.   I did not know.

14    Q.   Okay.  You're very soft-spoken.  Sometimes

15  it's hard to hear.

16    A.   I'm sorry.

17    Q.   It's okay.  Did anyone at Wells Fargo

18  mention your race or national origin when you were

19  issued the August 26th informal warning for CMP

20  results?

21    A.   Not that I know of.

22    Q.   Did anyone mention your Asian accent in

23  connection with the August 26th, 2014, informal

24  warning for CMP results?

25    A.   That something I did not remember.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

DUKE TRAN                                            May 19, 2017
TRAN vs WELLS FARGO BANK                                      171

1          Q.    Is there anything that you could look at

2     that would help you remember?

3          A.    It's been for a while, so I'm sorry.

4          Q.    Is there anything you can think of, as you

5     sit here today, that would help you remember?

6          A.    Not at this point.

7          Q.    Did anyone ever tell you that your

8     national origin or race was a factor that Wells

9     Fargo considered in issuing you the August 26th

10    informal warning?

11         A.    I'm not sure about that.

12         Q.    Do you have any information, from any

13    source, that your national origin or race was a

14    factor that Wells Fargo considered in issuing you

15    the August 26th, 2014, informal warning?

16         A.    That something I did not remember.  It

17    been for a long time.

18         Q.    Okay.  And is there anything that you

19    could look at that would help you remember?

20         A.    I don't remember at the time.

21         Q.    And what about the September 23rd, 2014,

22    informal warning?  Did anyone mention your race or

23    national origin when they delivered that warning to

24    you?

25         A.    I did not remember.


Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 63 of 125

1        Q.   And is there anything that you could look

2   at that would help you remember?

3        A.   It been for a long time, so...

4        Q.   Nothing you can think of?

5        A.   Yeah, nothing I can think of at the time.

6   I'm sorry.

7        Q.   It's okay.  Did anyone mention your Asian

8   action in connection with the September 23rd, 2014,

9   informal warning?

10       A.   That something I did not recall it.

11       Q.   Did anyone tell you that your race or

12  national origin was a factor in Wells Fargo's

13  decision to issue you the September 23rd, 2014,

14  informal warning?

15       A.   That's -- Not that I know of.  I do not

16  recall that.

17       Q.   Do you have any information, from any

18  source, that your race or national origin was a

19  factor that Wells Fargo considered in issuing the

20  September 23rd, 2014, informal warning?

21       A.   I did not recall.

22       Q.   Do you have any personal knowledge of what

23  factors Wells Fargo considered in deciding to issue

24  you the September 23rd, 2014, informal warning?

25       A.   It's been for a while now, so it's hard



Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment          Page 64 of 125