**LEAH C. LIVELY, OSB #962414**
leahlively@dwt.com
**SARAH E. AMES, OSB #132675**
sarahames@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

    Attorneys for Defendant
    Wells Fargo Bank, N.A.


IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

AT PORTLAND

| | |
|---|---|
| **DUKE TRAN,**<br><br>          Plaintiff,<br><br>v.<br><br>**WELLS FARGO BANK, N.A.,**<br><br>          Defendant. | Case No. 3:15-cv-00979-BR<br><br>**EXHIBIT 3, PART 2 TO THE<br>DECLARATION OF LEAH C. LIVELY** |


**DAVIS WRIGHT TREMAINE** LLP

By _____ S/ Leah C. Lively _____
    **Leah C. Lively, OSB # 962414**
    leahlively@dwt.com
    **Sarah E. Ames, OSB #132675**
    sarahames@dwt.com
    Attorneys for Defendant Wells Fargo Bank, N.A.


Page 1 – EXHIBIT 3, PART 2, TO THE DECLARATION OF LEAH C. LIVELY

```
 1              In her call notes on 11/13 of 2014, she
 2    states, quote:  "Duke states he was terminated
 3    yesterday by Peter LeDonne and Kimberly Thrush and
 4    Janice Norris.  Told him it was misconduct for calls
 5    with customer."
 6              Do you see that?
 7        A.   This is something I did not recall it.
 8        Q.   No, I'm asking if you see that on the
 9    page.
10        A.   Where is it?
11             MS. LIVELY:  It's right here.
12             MS. STEPHENSON:  I have a different one.
13             MS. LIVELY:  You have something different?
14             MS. STEPHENSON:  Sorry.
15             MS. LIVELY:  Oh, it's all right.  Here.
16    You may have something different.
17             MS. STEPHENSON:  He might have the right
18    one.
19             MS. LIVELY:  Oh, yeah.  No, we have
20    something goofy going on here.
21             All right.  I'll give him mine.
22             THE WITNESS:  Thank you.
23             MS. LIVELY:  He has my highlighted version
24    of it.
25        Q.   BY MS. LIVELY:  Does that note refresh
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 65 of 125

1    your recollection that you told Ms. Anders that you

2    had been told that the reason of your termination

3    was related to misconduct on customer calls?

4         A.   I'm not sure who Mr. Ander is.

5         Q.   It's somebody at HR.

6              I'm asking you if this refreshes your

7    recollection that, during your termination meeting,

8    you were told that the reason had to do with

9    misconduct on customer calls.

10        A.   This I did not recall.  But I do know I

11   contact the human resources to ask the reason why I

12   was terminated.  I spoke with one of the human

13   resources representative; and I'm not sure if she or

14   he, but they confirm -- I was really concerned why I

15   got terminated, and she would confirm with me

16   because call avoidance.

17             And I asked, "What is call avoidance?" and

18   she explained that what Peter and Kim reported as

19   something like, "Customer say 'hello' and you don't

20   say "hello," you did not respond."  So that why the

21   human resources told me that Kim and Peter reported

22   for call avoidance.

23        Q.   Would you agree that it would be

24   inappropriate to not respond to a customer on the

25   telephone?



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1    A.    I did not recall that.

2    Q.    No, I'm asking if that would be

3    inappropriate.  Would it -- Would it be bad for a

4    customer service representative to ignore a caller

5    on the phone?

6    A.    Yes.  Yeah, it's possible, yes.

7    Q.    And do you agree that that would be

8    grounds for termination if the customer service

9    agent did that several times?

10    A.    That, I did not recall that.

11    Q.    Did anyone ever tell you that your race or

12    national origin was a factor in Wells Fargo's

13    decision to terminate your employment?

14    A.    That something I did not know of.

15    Q.    Do you have any information, from any

16    source, that your race or national origin was a

17    factor that Wells Fargo considered in deciding to

18    terminate your employment?

19    A.    Can you repeat that question one more

20    time.

21    Q.    Yes.  Do you have any information, from

22    any source, that your race or national origin was a

23    factor that Wells Fargo considered in deciding to

24    terminate your employment?

25    A.    That something I did not know.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 67 of 125

1        Q.   Are you aware of any HEMASS customer

2   service agents who engaged in call avoidance

3   conduct?

4        A.   I did not know that.  I did not recall it.

5              (Exhibit 77 marked.)

6         THE WITNESS:  Thank you.

7        Q.   BY MS. LIVELY:  Mr. Tran, the court

8   reporter has handed you what's been marked as

9   Exhibit 77, which is a document entitled "addressing

10  inappropriate call handling behaviors and," quote,

11  "call avoidance," end quote.

12             Do you recognize this document?

13       A.   This has been for a while.  I did not

14  remember.

15       Q.   Do you recall that Peter LeDonne asked you

16  to sign this document on August 22nd, 2014, and you

17  refused to sign it?

18       A.   I did not remember that.

19       Q.   Are you disputing that that happened, or

20  do you just not remember one way or another?

21       A.   I did not remember he give me this one.

22       Q.   You don't remember if he gave you that

23  one?

24       A.   No, ma'am.

25       Q.   Do you remember, when Mr. LeDonne



1    presented you with Exhibit 77 on August 27th, 2014,

2    you responding that you were not going to sign the

3    document because you were working with human

4    resources and would not sign any documents until

5    that was done?

6              A.    That is something I did not remember.

7              Q.    Do you remember Mr. LeDonne telling you

8    that even if you wouldn't sign Exhibit 77, you were

9    still expected to comply with the policies contained

10   within it?

11             A.    I did not recall he said that.

12             Q.    Do you have any information -- Strike

13   that.

14             Are you disputing that Mr. LeDonne said

15   that, or do you just not recall?

16             A.    I did not recall he gave me this or say

17   anything about this.

18             Q.    Is there anything that you could look at

19   that would help you recall?

20             A.    Not at this time, ma'am.

21             Q.    Is there anything out there that you think

22   you might look at between now and trial, that would

23   help you recall?

24             A.    It's possible, yes; but right now I did

25   not remember he did that, he gave that to me.



1          Q.   What would be possible for you to look at,

2     that would help you recall?

3          A.   I do not remember.

4          Q.   Mr. Tran, do you have any reason to

5     dispute that the policy contained within Exhibit 77

6     applied to HEMASS customer service agents in your

7     location?

8          A.   I'm sorry.  Can you repeat it one more

9     time.

10         Q.   Yeah.  Do you have any reason to dispute

11    that the policies contained within Exhibit 77

12    applied to HEMASS customer service agents in your

13    location?

14         A.   That something I did not know.

15         Q.   Do you have any reason to believe that

16    Exhibit 77 was only given to you?

17         A.   I did not recall at that time.  Yeah, I

18    don't remember.

19         Q.   In Exhibit 77, towards the middle, there's

20    a definition and then it says, quote, call

21    avoidance, end quote.  Do you see that?

22         A.   Where do I see that?

23         Q.   In the middle, just above the bullet

24    points.

25              MS. STEPHENSON:   Right here.



```
 1            Q.   BY MS. LIVELY:  Go ahead.
 2            A.   I'm not recalling this.  I did not see
 3      that before.
 4            Q.   I'm not asking if you saw this.  I'm
 5      asking you if you have any information to dispute
 6      that Wells Fargo honestly believed that you had
 7      engaged in call avoidance, did not honestly believe
 8      that you engaged in call avoidance.
 9                 MS. STEPHENSON:  Objection.  Calls for
10      speculation.
11                 THE WITNESS:  I did not understand the
12      question.  I'm sorry.
13            Q.   BY MS. LIVELY:  Okay.  Do you have any
14      information that Wells Fargo didn't believe, at the
15      time they terminated you, that you'd committed call
16      avoidance?
17                 MS. STEPHENSON:  Objection.  Calls for
18      speculation.
19                 THE WITNESS:  I did not recall that.
20            Q.   BY MS. LIVELY:  Do you have any
21      information that they didn't believe that?
22                 MS. STEPHENSON:  Calls for speculation.
23                 THE WITNESS:  I did not know.
24                 MS. LIVELY:  Okay.  Let's take a break.
25                 THE VIDEOGRAPHER:  This marks the end of
```



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                        Page 71 of 125

1    media 2.  Going off the record.  The time is 2:15

2    p.m.

3                        (Recess.)

4        Q.   BY MS. LIVELY:  We are back on the record

5    in this matter.

6             Mr. Tran, do you realize that you're still

7    under oath?

8        A.   Yes, I do.

9        Q.   Mr. Tran, I'm now going to play for you a

10   series of telephone calls that have been produced in

11   this litigation.  The first call that I'm going to

12   play for you was produced in this litigation as

13   Wells Fargo 1385, and I'd like you to go ahead and

14   listen to it.  And it's segment number, for the

15   record, 764230698.

16                        (Reporter request.)

17                        (Audio clip played; not reported.)

18       Q.   BY MS. LIVELY:  Mr. Tran, do you have any

19   basis to dispute -- Sorry.

20            Mr. Tran, do you have any basis to dispute

21   that the call produced as Wells Fargo 1385 was not

22   an inbound call to you on July 3rd, 2014?

23       A.   I did not recall this.

24       Q.   I'm asking you if you have any information

25   to dispute that that's a call -- an inbound call



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment               Page 72 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
186

1    that came to you on July 3rd, 2014.

2              MS. STEPHENSON:  Objection.  Calls for

3    speculation.

4              THE WITNESS:  I apologize.  The one you

5    just playing?

6              MS. LIVELY:  Yes.

7              THE WITNESS:  The one you played here?

8              MS. LIVELY:  Yes.

9              THE WITNESS:  Yeah, I did know anything.

10   All I heard was just "hello."

11        Q.  BY MS. LIVELY:  Right.  I understand that.

12             I'm asking you if you have anything to

13   dispute that that call is one that appears as an

14   inbound call to your number on July 3rd, 2014.

15             MS. STEPHENSON:  Objection.  Calls for

16   speculation.

17             THE WITNESS:  I apologize.  I did not know

18   it was inbound or outbound call.

19        Q.  BY MS. LIVELY:  So you have nothing to

20   dispute that's an inbound call?

21        A.  I did not know.

22        Q.  You didn't know one way or the other; is

23   that fair to say?

24        A.  I did not know that that my call or not.

25        Q.  Okay.  That's what I'm asking.  Do you



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1   have any information to dispute whether that's your

2   call?

3        A.   I do not know.

4        Q.   Is there anything that you could look at

5   that would help you know?

6        A.   It's been a long time for that electronic

7   voice.  I did not recall it.

8        Q.   Do you have any information that Wells

9   Fargo did not honestly believe that the call

10  produced as Wells Fargo 1385 was an inbound call to

11  your number?

12       A.   Nothing for me to record inbound or

13  outbound call.  I did not know.

14       Q.   As you sit here today, what information do

15  you have that Wells Fargo did not honestly believe

16  that the call produced as 1385 was not an inbound

17  call to you?

18       A.   I did not know what Wells Fargo did in

19  that call.  I do not know.

20       Q.   All right.  I'm now going to play for you

21  a call that was produced in this litigation as Wells

22  Fargo 1386, segment ID 764230742.

23               (Audio clip played; not reported.)

24       Q.   BY MS. LIVELY:  Mr. Tran, as you sit here

25  today, do you have any information to dispute that



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

 1    the call produced as Wells Fargo 1386 was an inbound

 2    call to you on July 3rd, 2014?

 3              MS. STEPHENSON:  Objection.  Calls for

 4    speculation.

 5              THE WITNESS:  I did not know the recorded

 6    call.  I did not know.

 7         Q.   BY MS. LIVELY:  I'm asking if, as you sit

 8    here today, you can point me to any evidence that

 9    this was not a call received by you?

10              MS. STEPHENSON:  Calls for speculation.

11              THE WITNESS:  I did not hear anything.

12    All I just hear "hello."  I did not know what is --

13    what is that all about, what the record is about.

14         Q.   BY MS. LIVELY:  If you would have been

15    having problems with your headset or computer

16    malfunctioning on July 3rd, 2014, would you have

17    told somebody?

18         A.   Yes.

19         Q.   Mr. Tran, as you sit here today, do you

20    have any information that Wells Fargo did not

21    honestly believe that the call produced as Wells

22    Fargo 1386 was an inbound call received by you on

23    July 3rd, 2014?

24              MS. STEPHENSON:  Calls for speculation.

25              THE WITNESS:  I have no record to know if



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 75 of 125

1    it inbound or outbound call.

2          Q.    BY MS. LIVELY:    That's not what I'm asking

3    you, sir.

4          I'm asking you if, as you sit here today,

5    you have any information, from any source, that

6    Wells Fargo didn't actually believe that that call

7    was a call that came inbound to you?

8          A.    That, I did not know what -- what Wells

9    Fargo have that record.    I did not know.

10         Q.    So you don't know one way or another

11   whether Wells Fargo thought this was an inbound call

12   to you or didn't think this was an inbound call to

13   you?

14         A.    I did not know at all.

15         Q.    I'm now going to play for you a call that

16   was produced in this litigation as Wells Fargo 1387,

17   segment number 764395722.

18                    (Audio clip played; not reported.)

19         Q.    BY MS. LIVELY:    Mr. Tran, do you have --

20   as you sit here today, do you have any basis to

21   dispute that the call produced in this litigation as

22   Wells Fargo 1387 was not an inbound call made to

23   your number on July 24th, 2014?

24              MS. STEPHENSON:    Objection.    Lack of

25   foundation.    Calls for speculation.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment
Page 76 of 125

DUKE TRAN                                          May 19, 2017
TRAN vs WELLS FARGO BANK                                    190

1          Q.   BY MS. LIVELY:   Go ahead.

2          A.   It no way for me to know if inbound or

3    outbound call.   I did not record it.   It's

4    electronic voice.   I did not record it.

5          Q.   So do you have any information that

6    disputes that it was an inbound call to you?

7               MS. STEPHENSON:   Lack of foundation.

8    Calls for speculation.

9               THE WITNESS:   I do not know.

10         Q.   BY MS. LIVELY:   Okay.   And do you -- As

11   you sit here today, what information do you have, if

12   any, that Wells Fargo did not honestly believe that

13   the call produced as 1387 was an inbound call to you

14   on September 24th, 2014?

15              MS. STEPHENSON:   Objection.   Lack of

16   foundation.   Calls for speculation.   Assumes facts

17   not in evidence.

18         Q.   BY MS. LIVELY:   Go ahead.

19         A.   I did not know.

20         Q.   Do you have any information that Wells

21   Fargo did not honestly believe call 1387 was an

22   inbound call to you?

23              MS. STEPHENSON:   Same objection.

24              THE WITNESS:   I do not know it's inbound

25   or outbound call, based on that electronic voice.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment            Page 77 of 125

1      Q.   BY MS. LIVELY:  Okay.  That's not what I'm

2    asking.

3           I'm asking you if you have any

4    information, any evidence, that Wells Fargo did not

5    believe that call 1387 was an inbound call to you.

6           MS. STEPHENSON:  Same objection.

7      Q.   BY MS. LIVELY:  Do you have any such

8    evidence?

9           MS. STEPHENSON:  Same objection.

10          THE WITNESS:  I don't know how to answer

11   that question.

12     Q.   BY MS. LIVELY:  Well, do you -- if you

13   were going to testify at trial, "This is the

14   information I have to prove that Wells Fargo didn't

15   think this was a real call," what would you say?

16          MS. STEPHENSON:  Objection.  Lack of

17   foundation.  Assumes facts not in evidence.

18          THE WITNESS:  Yeah, I don't know what --

19   what the system, what Wells Fargo provide today.

20   I'd be -- I do not know.

21     Q.   BY MS. LIVELY:  So is it fair to say that

22   you don't have any information that Wells Fargo

23   didn't believe this was an inbound call to you on

24   September 24th, 2014?

25          MS. STEPHENSON:  Same objection.  Asked

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 78 of 125

 1    and answered.

 2          THE WITNESS:  I did not know; so nothing

 3    for me believe or not, because I did not know.

 4          Q.   BY MS. LIVELY:  I'm next going to play for

 5    you a call that was produced in this litigation as

 6    Wells Fargo 1388, segment ID 764398837.

 7                (Audio clip played; not reported.)

 8          Q.   BY MS. LIVELY:  Mr. Tran, as you sit here

 9    today, do you have any basis to dispute that the

10    phone call produced in this litigation as Wells

11    Fargo 1388 was an inbound call to you on September

12    24th, 2014?

13          MS. STEPHENSON:  Objection.  Lack of

14    foundation.  Assumes facts not in evidence.  Calls

15    for speculation.

16          Q.   BY MS. LIVELY:  Go ahead.

17          A.   Yeah, I did not know.

18          Q.   So do you have any evidence to dispute

19    that this was an inbound call to you?

20          MS. STEPHENSON:  Same objection.

21          THE WITNESS:  Yeah, I do not know what it

22    is, so...

23          Q.   BY MS. LIVELY:  So you can't dispute it

24    one way or another?

25          A.   I'm not sure what it is, so I cannot tell



Declaration of Leah C. Lively in Support of                       EXHIBIT 3
Defendant's Motion for Summary Judgment                        Page 79 of 125

```
 1   you I dispute it because I do not know.
 2        Q.   And do you have any information that Wells
 3   Fargo did not honestly believe that the call
 4   produced as 1388 was an inbound call to you on July
 5   24th, 2014?
 6             MS. STEPHENSON:   Same objection.
 7        Q.   BY MS. LIVELY:   Go ahead.
 8        A.   Yeah, I do not know about a call.
 9        Q.   I'm asking if you have any -- As you sit
10   here today, do you have any information that Wells
11   Fargo didn't believe that call 1388 was an inbound
12   call made to your number on July 24th?
13        A.   I do not know.
14             MS. STEPHENSON:   Same objection.  Asked
15   and answered.
16        Q.   BY MS. LIVELY:   You don't know.
17             All right.  I'd now like to play for you
18   the call that was produced in this litigation as
19   Wells Fargo 1389.
20             (Audio clip played; not reported.)
21        Q.   BY MS. LIVELY:   And, for the record, Wells
22   Fargo 1389 is segment ID 764398837.
23             Mr. Tran, do you have any basis to dispute
24   that the call produced in this litigation as Wells
25   Fargo 1388 was an inbound call to you from September
```

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 80 of 125

1  24th, 2014?

2          MS. STEPHENSON:  Objection.  Lack of

3  foundation.  Calls for speculation.  Assumes facts

4  not in evidence.

5          THE WITNESS:  I did not know.

6          Q.  BY MS. LIVELY:  And do you have any

7  information that Wells Fargo did not honestly

8  believe the call produced in this litigation as

9  Wells Fargo 1388 was an inbound call to you on

10  September 24th, 2014 -- I mean on July 24th, 2014?

11          MS. STEPHENSON:  Same objection.

12          THE WITNESS:  No.

13      Q.  BY MS. LIVELY:  Do you have any such

14  information?

15          MS. STEPHENSON:  Same objection.

16          THE WITNESS:  I did not know about a call.

17      Q.  BY MS. LIVELY:  Well, do you have any

18  information that Wells Fargo didn't believe this was

19  an inbound call to you?

20          MS. STEPHENSON:  Same objection.

21          THE WITNESS:  I did not know.

22      Q.  BY MS. LIVELY:  As you sit here today, do

23  you have any information that Wells Fargo didn't

24  actually believe this was an inbound call to you on

25  September 24th, 2014?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 81 of 125

DUKE TRAN                                              May 19, 2017
TRAN vs WELLS FARGO BANK                                       195

1           MS. STEPHENSON:  Same objection.  Asked

2    and answered.

3           THE WITNESS:  I did not know.

4      Q.   BY MS. LIVELY:  Mr. Tran, I'm now going to

5    play for you a call produced in this litigation as

6    Wells Fargo 1390, segment ID 764398878.

7                 (Audio clip played; not reported.)

8      Q.   BY MS. LIVELY:  Mr. Tran, do you have any

9    basis to dispute that the call produced in this

10   litigation as Wells Fargo 1390 was an inbound call

11   to your number on July 24th, 2014?

12           MS. STEPHENSON:  Objection.  Lack of

13   foundation.  Calls for speculation.  Assumes facts

14   not in evidence.

15           THE WITNESS:  Yeah, I have no -- I did not

16   know about inbound or outbound call.

17      Q.   BY MS. LIVELY:  So do you have any

18   information to dispute that that was an inbound call

19   to you?

20           MS. STEPHENSON:  Same objection.

21           THE WITNESS:  I did not know, ma'am.

22      Q.   BY MS. LIVELY:  As you sit here today, do

23   you know whether that was an inbound call to you?

24           MS. STEPHENSON:  Same objection.

25           THE WITNESS:  I did not know what it is.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of        EXHIBIT 3
Defendant's Motion for Summary Judgment            Page 82 of 125

1          Q.   BY MS. LIVELY:   Do you have any

2    information that Wells Fargo did not honestly

3    believe the call produced as 1390 was an inbound

4    call to you on July 24th, 2014?

5              MS. STEPHENSON:   Same objection.

6              THE WITNESS:   I have no way to know what

7    Wells Fargo have this.   I did not know.   I'm sorry.

8         Q.   BY MS. LIVELY:   So does that mean you

9    don't -- you don't know one way or another whether

10   Wells Fargo honestly believed this was an inbound

11   call to you on July 24th, 2014?

12             MS. STEPHENSON:   Same objection.

13             THE WITNESS:   Yeah, I did not know.

14        Q.   BY MS. LIVELY:   I'm now going to play a

15   call for you that was produced in this litigation as

16   Wells Fargo 1396, segment ID 778320431.

17                  (Audio clip played; not reported.)

18        Q.   BY MS. LIVELY:   Mr. Tran, do you have any

19   information to dispute that the call produced in

20   this litigation as Wells Fargo 1396 was an inbound

21   call to you from October 28th, 2014?

22             MS. STEPHENSON:   Objection.   Lack of

23   foundation.   Calls for speculation.   Assumes facts

24   not in evidence.

25        Q.   BY MS. LIVELY:   Go ahead.



ESQUIRE
DEPOSITION SOLUTIONS

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 83 of 125

1          A.    I have no way to know it is an inbound

2    call.  I do not know.

3          Q.    Do you have any information that Wells

4    Fargo did not honestly believe the call produced as

5    1396 was an inbound call to you on October 28th,

6    2014?

7               MS. STEPHENSON:   Same objection.

8               THE WITNESS:   I did not know.

9          Q.    BY MS. LIVELY:   Do you have any such

10   information?

11              MS. STEPHENSON:   Same objection.

12              THE WITNESS:   I do not know.

13         Q.    BY MS. LIVELY:   Now I'd like to play for

14   you a call that was produced in this litigation as

15   Wells Fargo 1398, segment ID 778320913.

16                   (Audio clip played; not reported.)

17         Q.    BY MS. LIVELY:   Mr. Tran, do you have any

18   information to dispute that the call produced in

19   this litigation as 1398 was an inbound call to you

20   on October 28th, 2014?

21              MS. STEPHENSON:   Objection.  Lack of

22   foundation.  Calls for speculation.  Assumes facts

23   not in evidence.

24              THE WITNESS:   Yeah, I have no way to know

25   that's an inbound or outbound call.  I did not know.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 84 of 125

DUKE TRAN                                          May 19, 2017
TRAN vs WELLS FARGO BANK                                    198

1      Q.   BY MS. LIVELY:   So do you have any
2   information to dispute that that was an inbound call
3   to you from October 28th?
4            MS. STEPHENSON:   Same objections.
5            THE WITNESS:   I did not know that.
6      Q.   BY MS. LIVELY:   Do you have any
7   information that Wells Fargo did not honestly
8   believe that the call produced as 1398 was an
9   inbound call to your number on October 28th, 2014?
10            MS. STEPHENSON:   Same objections.
11            THE WITNESS:   I have no way to know what
12   the inbound call is.
13      Q.   BY MS. LIVELY:   That's not what I'm
14   asking.  I'm asking if, as you sit here today, you
15   have information.
16            What information do you have that Wells
17   Fargo did not honestly believe that the call
18   produced as 1398 was an inbound call to you from
19   October 28th, 2014?
20            MS. STEPHENSON:   Same objections.
21            THE WITNESS:   I did not know.
22      Q.   BY MS. LIVELY:   Do you have any such
23   information that Wells Fargo didn't honestly believe
24   that?
25            MS. STEPHENSON:   Same objections.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

DUKE TRAN                                          May 19, 2017
TRAN vs WELLS FARGO BANK                                199

1           THE WITNESS:  I did not know that.

2           Q.    BY MS. LIVELY:  Mr. Tran, are you aware of

3    any HEMASS customer service agent who remained

4    silent on the line, as we just heard in these phone

5    calls, when a customer was saying, "Hello?  Hello?"

6    Are you aware of anyone who did that?

7           A.    Say it one more time, please.

8           Q.    Yeah.  Are you aware of any of your

9    colleagues or co-workers, any other HEMASS customer

10   service agents, who remained silent on the line with

11   a customer when the customer was saying, "Hello?

12   Hello?"

13          A.    Not that I know of.

14          Q.    Would you agree that that would be

15   inappropriate to remain silent on the line while the

16   customer was saying, "Hello?  Hello?"

17          A.    You mean inappropriate?

18          Q.    Yes.  Would it be wrong to do?

19          A.    Yes.

20          Q.    Do you have any personal knowledge of what

21   factors Wells Fargo considered in deciding to

22   terminate your employment in November of 2014?

23          A.    Can you repeat the question one more time,

24   please, Counsel.

25          Q.    Yes, of course.  Do you have any personal



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 86 of 125

1    which you were terminated, was your race or national

2    origin discussed?

3          A.    I'm sorry.  Could you repeat the question.

4          Q.    Sure.  Was your race or national origin

5    brought up during the meeting where you learned you

6    were being terminated?

7          A.    You mean the last meeting, the last one?

8          Q.    Yes, where you learned you were being

9    terminated.

10         A.    Not that I know of.

11         Q.    Did anyone at the meeting where you were

12   told you were terminated discuss the fact that you

13   had taken family leave?

14         A.    Not that I recall.

15         Q.    During the meeting at which you found out

16   you were terminated, did anyone discuss the fact

17   that you had reported unlawful activity regarding

18   concealing missing loan documents from customers?

19         A.    Not that I recall.

20         Q.    Do you have -- As you sit here today, what

21   information do you have that Wells Fargo considered

22   your report of missing -- concealing missing

23   customer loan documents in connection with your

24   termination?

25         A.    Can you explain one more time, please.



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                        Page 87 of 125

```
 1    I'm sorry.
 2         Q.   What information or evidence do you have
 3    that Wells Fargo considered your report of
 4    concealing missing loan documents as a factor in
 5    your termination?
 6              MS. STEPHENSON:  Objection.  Calls for a
 7    legal conclusion.
 8              THE WITNESS:  I didn't understand the
 9    question.  I'm sorry.
10         Q.   BY MS. LIVELY:  Do you have any
11    information that Wells Fargo considered your report
12    of unlawful activity regarding loan documents as a
13    factor in your termination?
14              MS. STEPHENSON:  Same objection.
15              THE WITNESS:  I'm not sure what Wells
16    Fargo have.  I do not know.
17         Q.   BY MS. LIVELY:  Mr. Tran, do you have any
18    information that other HEMASS customer service
19    agents at your location were provided with more
20    training compared to you?
21         A.   I did not recall that.
22         Q.   Mr. Tran, are you aware of other HEMASS
23    customer service agents in your location who
24    averaged below 95 percent on his or her CMP scores
25    for three consecutive months?
```



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment                    EXHIBIT 3
                                                          Page 88 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
204

1        A.    I did not know about other team member
2    score.

3        Q.    Do you have any information that other
4    customer service agents who averaged below 95
5    percent on CMP scores for three consecutive months
6    were not issued informal warnings?

7        A.    I did not know about other team member.
8    I'm sorry.

9        Q.    It's okay.  Are you aware of any other
10   HEMASS customer service agents in your location who
11   refused to attend weekly one-on-one coaching
12   sessions with their supervisors?

13       A.    Nothing I recall, but I did not know about
14   other team member.

15       Q.    Mr. Tran, are you aware of any HEMASS
16   customer service agents at your location who refused
17   to attend team meetings?

18       A.    I did not know about other team member.

19       Q.    Mr. Tran, are you aware of any HEMASS
20   customer service agents at your location who were
21   observed by a supervisor to be working on personal
22   items during after-call work after being instructed
23   not to?

24       A.    I'm not -- I'm sorry.  I did not know
25   about other team member and other supervisor.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

DUKE TRAN                                                    May 19, 2017
TRAN vs WELLS FARGO BANK                                          205

 1        Q.    Do you agree that after-call work was

 2    supposed to be used for finishing up notes from

 3    customer calls?

 4        A.    I apologize.  Can you repeat that one more

 5    time.

 6        Q.    Sure.  Do you agree that after-call work

 7    was supposed to be used for finishing up notes from

 8    customer calls?

 9        A.    You mean notated in the -- Yes.

10        Q.    And would you agree that after-call work

11    was not supposed to be used for working on personal

12    items unrelated to work?

13        A.    That, I did not recall that.

14        Q.    Did you think it was acceptable to use

15    after-call work to send personal e-mails?

16        A.    Not that I know of.

17        Q.    That's what I'm trying to find out, is if

18    -- Did you understand that after-call work was

19    supposed to be specific to the noting?

20        A.    "After call," I didn't mean -- I didn't

21    know what you meant by "after call."

22        Q.    You don't know what after-call work is?

23        A.    It's been for a while.  Sorry, I don't

24    remember.

25        Q.    You don't remember?



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment               Page 90 of 125

1            These appear to be e-mails between you and

2    other Wells Fargo employees regarding the loan where

3    -- regarding the customer with the missing loan

4    documents, that we just looked at in Exhibit 69.  Is

5    that correct?

6          A.    I apologize.  Can you say it one more

7    time.

8          Q.    Yes.  Are the e-mails in Exhibit 79, the

9    e-mails that are contained within 79, referring to

10   the same customer that we just looked at the notes

11   on in Exhibit 69?

12         A.    May I take a look at it?

13         Q.    Yes.

14         A.    Please.  Thank you.  Yeah, it is related.

15         Q.    Did you understand, during the time that

16   you were a HEMASS customer service agent, that there

17   were locations other than Clipper where customer

18   documents might be stored?

19         A.    I've been instructed by the management and

20   training, we have to look it up in Clipper, that the

21   main system would load it from the vault transfer to

22   the HEMASS Clipper; so that why we instructed to

23   look it up in the Clipper to see any document.

24         Q.    Right.  I understand that.

25               My question is:  Did you have an



Declaration of Leah C. Lively in Support of                 EXHIBIT 3
Defendant's Motion for Summary Judgment                     Page 91 of 125

1    understanding that, if something couldn't be found

2    in Clipper, that these research employees may be

3    able to find the document somewhere else?

4         A.   Yes.   That what they -- They give the

5    disposition code, because the Clipper can tell the

6    employee, if no document in the Clipper, instructed

7    to give -- to give you the code.   So the code stand

8    LU, that mean it loan unsecured.   And you take that,

9    you take the disposition code, that why you got the

10   EOD (indiscernible) in there, and we have to put

11   that in the note.

12        Q.   Okay.   I'm not sure if that answered the

13   question.

14             My question was:   Did you have an

15   understanding, when you were a customer service

16   agent, that if you couldn't find something in the

17   Clipper system, a research employee had other places

18   where they might be able to find the document?

19        A.   Possible, yes.

20        Q.   Okay.

21        A.   But with my understanding from the Clipper

22   and the disposition specialize work for the home

23   equity department, if we don't have any document,

24   they could be showed that right there.   That why we

25   escalate them to HEMASS group; it would transfer

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 92 of 125

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1     them to the Virginia processing document from the

2     vault.

3         Q.    And did you understand that the vault was

4     a place where documents might be before they got

5     loaded into the Clipper system?

6         A.    All I know, it's just from the e-mail what

7     Michael respond back to me in the policy for

8     follow-up.

9         Q.    Okay.  So getting back to my original

10    question:  Did you understand that not every

11    customer document might have been included in the

12    Clipper system?

13        A.    Yeah, I'm not sure what Wells Fargo did

14    with that part.

15        Q.    Okay.  And can you understand why Wells

16    Fargo would want to make sure that they had looked

17    in all their different places for a customer

18    document before telling a customer that document

19    doesn't exist?

20        A.    I think because the customer requesting,

21    the balloon would end it, and customer want to know

22    where the document is.  So Wells Fargo, the lender,

23    to respond to the customer to research.  So if we

24    don't have any document, then I'm not sure what

25    Wells Fargo to do with that.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 93 of 125

1          Q.    Okay.  But I guess what I'm asking is:

2     Did you understand that Wells Fargo wanted its

3     agents to make sure that the research was done?

4          A.    Based on the e-mail, yes.

5          Q.    Okay.  All right.  It appears from

6     Exhibit 79 like that Michael Scott Childress was

7     also a customer service representative; is that

8     correct?

9          A.    I'm not sure what his title when he move

10    up to the -- to the HEMASS escalation group.

11         Q.    Was he a manager in December 2013?

12         A.    I did not work with Mike at the same

13    group.  I did not know.  But I -- I did not know he

14    handle this until he put me a team lead.  At that

15    point, I do not know.

16         Q.    Okay.  Do you know one way or another

17    whether Mr. Childress was a manager?

18         A.    He's a part of the research group.

19         Q.    Right.  I'm asking whether you know if he

20    was a manager.

21         A.    I do not recall that.

22         Q.    And if you look at the bottom of the first

23    page of Exhibit 79, there's an e-mail from somebody

24    named Cheryl Fuquay to Angel Brown.

25              Do you see that e-mail?  It's at the very



1    remember who that was.

2        Q.    Okay.  And do you remember what the team

3    lead told you?

4        A.    We look it up on Clipper.

5        Q.    Okay.  Did the team lead tell you -- Was

6    the team lead a male or female, do you remember?

7        A.    It's a female.

8        Q.    Okay.  Do you remember if it was Heather

9    Stone?

10       A.    I don't remember.

11       Q.    Okay.  So you looked it up on Clipper, and

12   then what happened?

13       A.    Then the Clipper system will tell you if

14   the customer have any inmate, like a document --

15       Q.    Right.  I'm trying, Mr. Tran, to figure

16   out this situation that is the basis for your

17   lawsuit.

18            You're alleging that you reported what you

19   thought to be unlawful activity; and so I'm trying

20   to figure out when you made that report, who you

21   made that report to.

22            Did you ever make a report to anyone at

23   Wells Fargo, that you thought an employee of Wells

24   Fargo was violating a law or rule or regulation?

25       A.    I did not at that time.



 1        Q.    Did you at any time?

 2        A.    I did not.

 3        Q.    Did you ever lie to a customer about

 4   whether their loan documents were missing?

 5        A.    Because we have a call monitor, we cannot

 6   lie to the customer.  That where CMP came from.

 7        Q.    CMP is very strict; is that right?

 8        A.    Yes.

 9        Q.    Did you think it was -- Did Mr. LeDonne

10   ever tell you that you should lie to the customer

11   about missing documents?

12        A.    I -- I think, in March, when we have

13   Nathan e-mail me and he want to know why the last

14   three month we don't follow up.

15        Q.    Okay.  I want to make sure I'm following

16   you.

17              So you're saying Peter -- We looked at

18   when Nathan e-mailed, right, and said the last agent

19   didn't follow up?

20        A.    That's me.

21        Q.    That's you?

22        A.    Yes.

23        Q.    Okay.  And then Peter came to you to find

24   out why you didn't follow up?  I'm just trying to

25   follow what's happening here.



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment                    Page 96 of 125

1      A.   I think Peter probably know this.  When we

2  send to HEMASS, it was under my name, his direction;

3  he probably see that.

4      Q.   Okay.  I understand that.

5           What I'm asking is:  As you -- As you sit

6  here, do you recall you and Peter having a

7  discussion about that account?

8      A.   Yes.  He came to me.  He said --

9      Q.   Okay.

10      A.    -- they hire a lawyer.  And he told me I

11  put the company at risk.

12      Q.   Why -- Did he say why you put the company

13  at risk?

14      A.   That with him, him and Heather.  I did not

15  know.  I'm not sure what he did.

16      Q.   Okay.  So I'm trying to understand what

17  happened here.

18           So, at some point in time, Peter comes to

19  you and says they've hired -- that this customer has

20  hired a lawyer.

21           When -- When in time did Peter come to you

22  and tell you that?

23      A.   Oh, I do not remember.  I think before

24  that, probably before the e-mail sent out in April.

25      Q.   Before that?  Close in time?



Declaration of Leah C. Lively in Support of                EXHIBIT 3
Defendant's Motion for Summary Judgment                Page 97 of 125

DUKE TRAN                                                           May 19, 2017
TRAN vs WELLS FARGO BANK                                                     243

```
 1            A.   Yeah, I'm not sure.  Yeah.
 2            Q.   Okay.  So Peter tells you the customer has
 3       hired a lawyer.
 4                 What's your best recollection, like if
 5       you're -- again, if you're going to be at trial, in
 6       front of a jury and a judge, and you're going to
 7       say, "This is what Peter said to me," what -- what
 8       are you going to say?
 9            A.   Well, I'm afraid what -- what Peter said;
10       because he said, if I tell the customer one more
11       time, that I could be lost my job.
12            Q.   If you tell the customer what one more
13       time?
14            A.   You know, about like no document,
15       something like the April sent out or something like
16       that.  You know, we not allowed to tell the
17       customer.  I'm not sure what happened in the
18       conversation with other supervisor is.
19            Q.   So you're -- Mr. Tran, this is my only
20       opportunity to find out what your recollection of
21       your conversation with Peter was like.
22                 Your recollection is that Peter talks to
23       you and tells you the customer has an attorney,
24       you're putting the company at risk, and you're not
25       allowed to tell this customer what happened to their
```

ESQUIRE
DEPOSITION SOLUTIONS

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

DUKE TRAN                                           May 19, 2017
TRAN vs WELLS FARGO BANK                                      246

1    December 13, saying, "We don't have that document
2    already on file."  But it took three month for
3    Heather to -- for Heather to follow up and Nathan to
4    follow up to confirm we don't have no document.
5         Q.   Did --
6         A.   That why it come back to me in March and
7    April.
8         Q.   Did you think Peter was doing anything
9    unlawful by not telling customers that their
10   documents were missing?
11        A.   I have no idea what -- what Peter do.
12        Q.   Well, I'm asking if you thought what -- if
13   you thought that not telling customers their
14   documents were missing was unlawful?
15        A.   I didn't know at that time.  I didn't
16   recall it.
17             MS. LIVELY:  All right.  Let's take a
18   break.
19             THE VIDEOGRAPHER:  Going off the record.
20   This marks the end of media 3.  The time is
21   3:54 p.m.
22                  (Recess.)
23             THE VIDEOGRAPHER:  Going back on the
24   record.  This marks the beginning of media 4.  The
25   time is 4:08 p.m.



Declaration of Leah C. Lively in Support of            EXHIBIT 3
Defendant's Motion for Summary Judgment           Page 99 of 125

```
 1                  MS. LIVELY:  The nine -- eight.

 2                  MS. STEPHENSON:  Is it the 08/26 one?

 3                  MS. LIVELY:  08/26.

 4                  MS. STEPHENSON:  Yeah.

 5                  MS. LIVELY:  Okay.  Sixteen?

 6                  MS. STEPHENSON:  Yep.

 7              Q.    BY MS. LIVELY:  Mr. Tran, you have before

 8     you Exhibit 16, which is a document previously

 9     marked in this case, an exhibit previously marked in

10     this case.

11                  Do you recognize Exhibit 16?

12              A.    I do not remember.

13              Q.    Do you remember receiving an informal

14     warning related to your CMP scores?

15              A.    Yes.

16              Q.    And do you remember receiving that

17     informal warning on or around August 26th, 2014?

18              A.    I do not remember exactly what date.

19              Q.    Does the end of August sound about right?

20              A.    I'm not sure about that.

21              Q.    Do you have any reason to dispute that you

22     received the informal warning on August 26th, 2014?

23              A.    I would dispute it, yes.

24              Q.    You'd dispute it?

25              A.    Yes.
```



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                   Page 100 of 125

1          Q.    Okay.  When did you receive the informal

2    warning for CMP?

3          A.    I do not remember.

4          Q.    No.  No, I think -- I think I just

5    realized what we're saying.

6                I'm just asking you whether you dispute

7    the date that you got this.

8          A.    I do not remember what date.

9          Q.    Okay.

10         A.    Yeah, I'm sorry.

11         Q.    But you're not disputing the fact that

12   Wells Fargo tried to give you this document?

13         A.    I did not remember.

14         Q.    You don't remember somebody at Wells Fargo

15   trying to give you this informal warning?

16         A.    I remember disputing it, but I did not

17   remember --

18         Q.    You don't remember somebody trying to

19   issue this to you?

20         A.    It's been for a while.  I forgot about it.

21         Q.    Okay.  Do you have any information that

22   Wells Fargo did not believe your CMP scores were

23   below 95 percent for June, July, and August, at the

24   time they issued you the informal warning?

25               MS. STEPHENSON:  Objection.  Lack of



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 101 of 125

1    foundation.  Calls for speculation.  Assumes facts

2    not in evidence.

3              THE WITNESS:  I did not remember, Counsel.

4         Q.  BY MS. LIVELY:  Well, I'm not asking if

5    you remember.

6              I'm asking:  Do you have any information,

7    do you have any evidence, that Wells Fargo didn't

8    honestly believe your CMP scores were as reflected

9    on Exhibit 16?

10             MS. STEPHENSON:  Same objections.

11             THE WITNESS:  I did -- I did not recall at

12   that time.

13        Q.  BY MS. LIVELY:  You -- I don't understand

14   your response of "I don't recall."

15             Do you -- As you sit here today, do you

16   have any information that Wells Fargo didn't believe

17   these were your CMP scores?

18             MS. STEPHENSON:  Same objections.

19             THE WITNESS:  I do not remember.  It been

20   for a while.

21        Q.  BY MS. LIVELY:  At the time, did you have

22   any information that Wells Fargo did not believe

23   that the CMP scores listed in Exhibit 16 were

24   accurate?

25             MS. STEPHENSON:  Same objections.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1          THE WITNESS:  I know I disputing it, but I

2     didn't know -- I did not know.

3          Q.   BY MS. LIVELY:  Right.  I know you

4     disputed it, but -- but did you have -- do you have

5     any information that either Peter LeDonne or

6     Kimberly Thrush knew or thought that the CMP scores

7     were inaccurate?

8          MS. STEPHENSON:  Same objections.

9          THE WITNESS:  I do not remember.  I was

10    disputing it and they coming back.  I'm not sure

11    what month it was overturned.

12         Q.   BY MS. LIVELY:  Well, one of -- one of the

13    violations was overturned; correct?

14         A.   I do not remember that.

15         Q.   Okay.  Did the issuance of the August 26th

16    informal warning alter the benefits that you were

17    eligible for or received at Wells Fargo?

18         A.   I apologize.  I didn't understand the

19    question.

20         Q.   Well, did your benefits -- your 401(k),

21    your health insurance -- did any of that change when

22    you got the informal warning?

23         A.   No, ma'am.

24         MS. STEPHENSON:  Objection.  Lack of

25    foundation.



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                    Page 103 of 125

1          Q.   BY MS. LIVELY:   Did your pay rate change

2     when you received the August 26th informal warning?

3          A.   No, ma'am.

4          Q.   Did the number of hours that you worked

5     each week change after you got the August 26th

6     informal warning?

7          A.   No, ma'am.

8          Q.   Did your job duties as a customer service

9     representative change after you got the August 26th

10    informal warning?

11         A.   Not -- No, ma'am.

12         Q.   Who delivered the August 26th informal

13    warning to you?

14         A.   I did not remember.

15         Q.   Is there anything that you could look at

16    that would help you remember?

17         A.   Not that I know of right now.

18         Q.   Do you know what factors Wells Fargo

19    considered in deciding to issue you the August 26th,

20    2014, informal warning?

21         A.   I did not remember that.  I'm sorry.

22         Q.   Okay.  Is there anything that you could

23    look at that would help you remember?

24         A.   Not that I know of right now.

25         Q.   When -- When the August 26th informal



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 104 of 125

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
254

1    warning was issued to you, did anyone mention the

2    fact that you had taken family leave?

3        A.    That something I did not recall.  I do not

4    remember that.

5        Q.    When the August 26th informal warning was

6    issued to you, did anyone mention the issue of

7    missing customer documents?

8        A.    Not that I recall it.

9        Q.    Do you have any information that Wells

10   Fargo considered your report of concealing missing

11   loan documents from customers as a factor in issuing

12   you the August 26th informal warning?

13       A.    Can you repeat that question one more

14   time.

15       Q.    Sure.

16       A.    I apologize.  I couldn't understand the

17   question.

18       Q.    No, no.  That's fine.

19            Do you have any information that Wells

20   Fargo considered your report, the report that you

21   brought to Peter about concealing missing loan

22   documents, that Wells Fargo considered that report

23   in deciding to issue the informal warning on August

24   26th?

25       A.    I'm not sure what Wells Fargo do.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 105 of 125

1      Q.   Well, go ahead and look at the document,

2    Mr. Tran.  There are several concerns listed within

3    the document:  Failure to follow instructions,

4    failure to follow department processes and

5    procedures, unprofessional communications.  And what

6    I'm asking is if you have any information that Wells

7    Fargo did not honestly believe that you had engaged

8    in the conduct listed.

9      A.   I don't remember the document, what Peter

10   wrote in there.  I did not recognize -- I don't

11   remember this.

12     Q.   Okay.  Well, that's not what I'm asking.

13   Let's -- Let's go step by step.

14             Do you have any information that Wells

15   Fargo did not honestly believe that on 06/25 and

16   09/09 you refused to meet with leadership when

17   asked?

18             MS. STEPHENSON:  Objection.  Lack of

19   foundation.  Calls for speculation.

20             THE WITNESS:  I said I did not remember.

21   I'm sorry.

22     Q.   BY MS. LIVELY:  You just don't remember

23   whether that happened one way or the other?

24     A.   I don't remember.

25     Q.   Okay.  What about on 09/12?  Do you



1    remember whether you refused to attend the team

2    meeting and take -- and instead continue to take

3    inbound calls?

4         A.   That, I did not know.

5         Q.   Does that mean you just don't remember one

6    way or another?

7         A.   I did not know.  I don't remember in that

8    time.  I apologize.

9         Q.   No, it's okay.  You don't need to

10   apologize.  If you -- If you don't remember, you can

11   just tell me you don't remember.

12        A.   Yes.

13        Q.   I just need to get the best memory of

14   whatever you have.

15             Is there anything that you could look at,

16   that would help refresh your memory as to whether

17   you missed a team meeting on September 12th and

18   continued to take inbound calls?

19        A.   That, I do not remember.  It been for a

20   while -- for a while.  I'm so sorry.

21        Q.   Right.  No, I understand.

22             Is there anything that you think you could

23   look at that would help you remember?

24        A.   Not that I can think of at this time.

25        Q.   Okay.  The next item listed is on August



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

```
 1   26th, 2014:  "Worked on personal items during

 2   after-call work, after being reminded that

 3   after-call work is solely for finishing up account

 4   notes."

 5            Do you have any information -- Strike

 6   that.

 7            Do you have any recollection of whether

 8   you worked on personal items during after-call work

 9   on August 26th, 2014?

10            A.   And that something I cannot remember.

11            Q.   You just can't remember one way or

12   another?

13            A.   It's been for a long time, so I don't

14   know.

15            Q.   That's okay.  If you can't remember, you

16   can just say "I don't remember."

17            A.   Yes.

18            Q.   Is there anything that you can look at

19   that would help you remember?

20            A.   Not that I can look to today.

21            Q.   Is there anything that's -- I know you --

22   "nothing today"; but is there anything out there,

23   between now and trial, that you think might help jog

24   your memory?

25            A.   Not that I recall at the time.
```



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 108 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
260

1    Q.   Okay.  And then the next entry is

2  September 18th, 2014, says:  "Reset your after-call

3  work time so that it appeared shorter than your

4  actual after-call work."

5               Do you have any reason to dispute that?

6         A.   I did not understand what did that mean.

7  I'm sorry.

8         Q.   Well, it's saying that your after-call

9  work was set at a certain time, and then you reset

10  the clock so that it appeared as if you were in a

11  lesser amount of after-call work.

12               MS. STEPHENSON:   Objection.  Lack of

13  foundation.  Assumes facts not in evidence.

14               THE WITNESS:   Yeah, I did not know about

15  this.  And I don't remember about the system.

16               MS. LIVELY:   Okay.

17               THE WITNESS:   I apologize.

18               MS. LIVELY:   Let's go ahead and mark this.

19                    (Exhibit 82 marked.)

20         Q.   BY MS. LIVELY:   Mr. Tran, the court

21  reporter has handed you what's been marked as

22  Exhibit 82, which includes an e-mail from Cheryl

23  Weinfurtner to Mr. LeDonne, dated September 18th,

24  2014.

25               Have you seen this document before today?



800.211.DEPO (3376)
EsquireSolutions.com
Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment              Page 109 of 125

DUKE TRAN                                                May 19, 2017
TRAN vs WELLS FARGO BANK                                        261

1          A.    May I read it?

2          Q.    Yes, please.

3          A.    Yeah, I do not remember.

4               May I ask who Cheryl Weinfurtner is?

5          Q.    She's the customer service team lead.

6          A.    This is something I don't remember; but

7     possible, yes.

8          Q.    Okay.  Do you have any reason to believe

9     that Ms. Weinfurtner was being untruthful in the

10    e-mail that she sent on September 18th?

11         A.    I'm not sure what she thinking at that

12    time.  I apologize.

13         Q.    Do you remember whether you reset your

14    after-call work -- you reset the clock so it went

15    from 16 minutes to zero, on September 18th, 2014?

16         A.    I did not remember that.  I forget about

17    the system I was working on.

18         Q.    Okay.  So you're not saying it didn't

19    happen; you're just saying you don't remember?

20         A.    I don't remember.

21         Q.    Okay.

22         A.    And I'm not sure who she is.

23         Q.    Okay.  The next entry is nine twenty --

24    and we're going back to Exhibit 81.  The next entry

25    is 09/23/14:  "Refused to offer available



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of          EXHIBIT 3
Defendant's Motion for Summary Judgment          Page 110 of 125

1    A.    Yes.

2    Q.    And are you saying that the phrase

3  "end-of-term options" is something that you don't

4  understand?

5    A.    Yeah, I did not understand the word

6  "end-of-term option."  If the balloon ended the

7  term, then we give the customer the option to apply,

8  or we go to foreclosure, or...

9    Q.    You would go to foreclosure on the end of

10 a home equity balloon?

11   A.    The balloon would go to collection, then

12 it would go to foreclosure, unless -- I'm not sure

13 what the next step is.

14   Q.    The next two entries are for

15 unprofessional communications on September 10th and

16 September 11th.

17         Do you recall those?  They were instant

18 message chats.

19         MS. STEPHENSON:  Objection.  Lack of

20 foundation.  Assumes facts not in evidence.

21   Q.    BY MS. LIVELY:  Do you recall that?

22   A.    I did not remember that, no.  I'm sorry.

23   Q.    Are you saying it didn't happen, or are

24 you just saying you don't recall?

25   A.    I did not remember in that time.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1          Q.    Now that we've looked at all the items

2     that are included in your informal warning, do you

3     have any information -- as you sit here today, what

4     information do you have that Wells Fargo did not

5     honestly believe the reasons set forth for your

6     informal warning?

7               MS. STEPHENSON:    Objection.    Lack of

8     foundation.    Assumes facts not in evidence.    Calls

9     for speculation.

10              THE WITNESS:    I did not remember at that

11    point in time.    I'm sorry.

12         Q.    BY MS. LIVELY:    Do you have any

13    information that Wells Fargo did not honestly

14    believe the reasons stated for your informal

15    warning?

16         A.    I did not recall.    I did not remember.

17         Q.    Is there anything that would help you

18    recall?

19         A.    Not that I know of.

20         Q.    And was your rate of pay reduced as a

21    result of the informal warning?

22         A.    I apologize.    Can you explain one more

23    time.

24         Q.    Certainly.    Your hourly rate of pay, was

25    that reduced as a result of the informal warning?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of            EXHIBIT 3
Defendant's Motion for Summary Judgment                Page 112 of 125

1        A.    No, ma'am.

2        Q.    And were the benefits that are available

3    -- were available to you, changed as a result of the

4    informal warning, like your 401(k), your health

5    insurance?

6        A.    For the benefit?

7        Q.    The benefits.

8        A.    Yes, ma'am.

9        Q.    Did those change as a result of the

10   informal warning?

11       A.    No, ma'am.

12       Q.    And did the number of hours that you

13   worked change as a result of the informal warning?

14       A.    No, ma'am.

15       Q.    And did your job duties get changed as a

16   result of the informal warning?

17       A.    No, ma'am.

18             (Sotto voce remarks.)

19       Q.    BY MS. LIVELY:   Mr. Tran, do you have any

20   information or evidence that your report of -- your

21   report to Peter LeDonne that it was inappropriate to

22   conceal missing documents was a factor that Wells

23   Fargo considered in issuing you your informal

24   warning?

25             MS. STEPHENSON:   Objection.   Calls for



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment
EXHIBIT 3
Page 113 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
266

1    speculation.  Calls for a legal conclusion.

2              THE WITNESS:  That, I do not remember,

3    Counselor.

4              MS. LIVELY:  As you sit here today, do you

5    have any information that you believe connects your

6    report about concealing lost documents to the

7    informal warning?

8              MS. STEPHENSON:  Same objections.

9              THE WITNESS:  I don't -- I do not know.

10             (Exhibit 83 marked.)

11        Q.   BY MS. LIVELY:  Mr. Tran, the court

12   reporter has handed you what's been marked as

13   Exhibit 83, which is a document titled "team member

14   intermittent request form."

15             Do you recognize this document?

16        A.   May I read it, ma'am?

17        Q.   Yes.

18        A.   I apologize.  I don't have my glasses

19   today.

20        Q.   Oh.

21        A.   I forgot them.

22        Q.   Hard day to not have your glasses.

23        A.   Yes.

24        Q.   And it appears that, on this document,

25   that you submitted it or signed it on August 5th,



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 114 of 125

1    you know, checking account -- When I came over to

2    ask Peter, Peter totally ignore me, tell me to

3    looking for something else.

4        Q.    When did -- When did Peter's treatment of

5    you change?  When did you notice that it changed, or

6    was he always rude to you?

7        A.    Peter and I get along really good at

8    first.  Then after the missing document, the April

9    sent out, I was concerned about business at that

10    point, the CMP disputing, Peter start treating me

11    different.

12        Q.    And the CMP dispute, was that the informal

13    warning that we just looked at?

14        A.    The one that was something that was

15    overturned.  I'm not sure.

16        Q.    Okay.  Because you received an informal

17    warning on August 26th for your CMP results.  That's

18    the one you disputed and something within that got

19    overturned?

20        A.    I did not remember.  I'm not sure, June or

21    August, but start from that point in time, between

22    May, all the way up, and then start Peter and

23    Kimberly being strict with me.

24        Q.    Why did you tell Glenda Longren that it

25    all started after you took family leave, FMLA leave?



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 115 of 125

1    now than you did two years ago?

2         A.    It's hard for me to remember now.  It's

3    been for a while.

4         Q.    Well, that's what I'm asking.  I'm asking

5    if your e-mails that you sent at the time would be a

6    more accurate reflection of what was going on than

7    your memory now.

8         A.    I don't remember.

9         Q.    It's not a memory question.  It's a do you

10   think your -- Do you think your e-mails were

11   accurate at the time that you wrote them?

12        A.    I sent a lot of e-mails.  I didn't recall

13   until you show it to me.

14        Q.    Right.  And what I'm asking is:  Were you

15   truthful in your e-mails at the time that you sent

16   them?

17        A.    That's yes.

18        Q.    After you complained about discrimination

19   and harassment, do you believe that Wells Fargo took

20   any negative employment actions against you because

21   of that complaint?

22             MS. STEPHENSON:  Objection.  Calls for

23   speculation.  Assumes facts not in evidence.

24             THE WITNESS:  I did not know what Wells

25   Fargo did.



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment
EXHIBIT 3
Page 116 of 125

1    Fargo took a negative action against you because you

2    made a complaint of discrimination or harassment?

3         A.   Can you explain to me.  I apologize.  I

4    have a lot of question.

5         Q.   Yeah.  You made a lot of complaints while

6    you worked for Wells Fargo.  We talked about the

7    family leave medical -- Oregon Family Leave Act, the

8    Family Medical Leave Act.  We've talked about the

9    missing customer documents.

10        The complaint I'm specifically talking

11   about now is the complaint that Peter was treating

12   you differently because you're Asian.  Okay?

13        After you made that complaint, do you

14   believe that Wells Fargo took a negative action

15   against you because you made that complaint?

16        MS. STEPHENSON:  Objection.  Asked and

17   answered.

18        THE WITNESS:  That, I don't know what

19   Wells Fargo did to me -- or, I mean, what Wells

20   Fargo did.  I did not know what they do.

21        Q.   BY MS. LIVELY:  Well, what I'm trying to

22   find out is:  What's the basis for your claim in

23   this lawsuit, that you got retaliated against for

24   making a complaint of race or national origin

25   discrimination?



Declaration of Leah C. Lively in Support of                    EXHIBIT 3
Defendant's Motion for Summary Judgment                    Page 117 of 125

1          Do you think that that complaint,

2    complaining that Peter was discriminating against

3    you because you were Asian, do you think Wells Fargo

4    took some negative action against you because you

5    made that complaint?

6            MS. STEPHENSON:  Objection.  Assumes facts

7    not in evidence.

8            THE WITNESS:  I did not know what Wells

9    Fargo do, and I do not know what Wells Fargo

10   thinking to do.

11       Q.   BY MS. LIVELY:  So, as you sit here today,

12   do you have any information that Wells Fargo took a

13   negative action against you because you made a

14   complaint of race or national origin discrimination?

15       A.   I did not know what Wells Fargo did.  I'm

16   sorry.

17       Q.   Well, I'm trying to find out if you have

18   any information that you believe supports that idea.

19       A.   I do not know.

20       Q.   Okay.  Do you have any information that

21   Wells Fargo had a company-wide policy to conceal the

22   fact that customer loan documents were missing?

23       A.   I don't know what Wells Fargo did on their

24   part.

25       Q.   The only document you saw was an e-mail --



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 118 of 125

 1   on the subject, was an e-mail from Caz Moreland;

 2   correct?

 3       A.   That's the one e-mail they sent to it me,

 4   yes.

 5       Q.   And so what I'm asking is:  Do you have

 6   any information that that was part of a company-wide

 7   policy?

 8       A.   Not that I recall.

 9       Q.   And previously we had -- you had told me

10   about discussion -- a discussion you had with Peter

11   regarding the missing loan documents, where he told

12   you not to tell customers that the loan documents

13   were missing.

14            Did you raise that concern to any managers

15   above Peter?

16       A.   I discuss with Alan Rose in his office,

17   and he told me that the senior management handle it

18   and he wanted me to focus, you know, to do my job.

19       Q.   What's your best recollection of what you

20   told Mr. Rose on that subject?

21       A.   I apologize.  Say it one more time.

22       Q.   Sure.  I'm trying to get your best memory

23   of what you told Mr. Rose about the missing loan

24   documents.

25            If you -- Again, if you were going to be

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1   testifying at trial and your attorney were to say to

2   you, "Mr. Tran, please tell the jury what you told

3   Mr. Rose about missing documents, the missing

4   documents," what would you say?

5        A.   The e-mail was sent out and there was a

6   supervisor or management said that came from the

7   senior management.  So that what -- I'm not sure

8   where it came from; but when it said senior

9   management, so Alan is the higher up in the

10   department.

11        Q.   So in the conversation you had with Alan

12   in his office, how did you raise the issue?  How did

13   you bring that up, the missing loan documents issue?

14   What did you say to him?

15        A.   It's been for a while.  I don't remember.

16   I met him a few times, so I don't remember.  Sorry.

17        Q.   Do you -- Do you have any memory of what

18   you said to him?

19        A.   I would talk to him about just CMPs and a

20   lot of concern, but I don't remember.  It's a few

21   topic, but I forgot about it.

22        Q.   Okay.  And I'm just focusing on the

23   missing loan documents piece right now.

24             Do you remember what you told Mr. Rose

25   about that issue?



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 120 of 125

DUKE TRAN
TRAN vs WELLS FARGO BANK

May 19, 2017
279

1      A.   I did told him about that.

2      Q.   Right.  I'm trying to find out what you

3   told him, what you remember telling him.

4      A.   About the missing documents?

5      Q.   Yes.

6      A.   "We don't have the document," and, "How we

7   handle this?"

8      Q.   Okay.  Tell me about that conversation.

9   What did you say to him?

10     A.   He's told me that is --

11     Q.   What -- What did you say to him?  How did

12  you bring it up?

13     A.   I -- I don't remember; it's been for a

14  while.  But I did talk to Alan.

15     Q.   Okay.  Is there anything that you could

16  look at that would help you remember what you said

17  to Mr. Rose about the missing loan documents?

18     A.   Not that I recall now.

19     Q.   Okay.

20     A.   It been for a while.

21     Q.   And your recollection is that Mr. Rose

22  told you not to worry about that; to let senior

23  management deal with it?

24     A.   Yes.

25     Q.   Do you recall him saying anything else?



800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 121 of 125

1       A.   He told me he's -- he will meet with the

2   team management from -- from meeting, something like

3   that.  I talk to him a few times, so I'm not sure I

4   remember it.

5       Q.   Do you have any information that Kimberly

6   Thrush was aware that you had complained about the

7   practice of concealing from customers that their

8   loan documents were missing?

9       A.   I apologize.  Can you explain one more

10  time.

11      Q.   Yeah.  Do you have any information -- You

12  said you talked to Peter about the issue, and you

13  said that you talked to Mr. Rose about the issue.

14          Do you have any information that Kimberly

15  Thrush was aware that you had voiced concerns to

16  either Mr. LeDonne or Mr. Rose about the missing

17  loan document issue?

18      A.   I did not know Kimberly aware or not.

19      Q.   What about Toni Arnold?  Do you know who

20  she is?

21      A.   I don't remember who she is.

22      Q.   Do you have any information that she was

23  aware that you had expressed concerns about

24  concealing customer loan documents?

25      A.   I don't remember who she is.



```
 1                        (Pause.)
 2              THE WITNESS:  May I go to the restroom?
 3              MS. LIVELY:  Oh, of course.  Let's take a
 4     break.
 5              THE WITNESS:  Thank you.
 6              THE VIDEOGRAPHER:  Going off the record.
 7     The time is 4:55 p.m.
 8                        (Recess.)
 9              THE VIDEOGRAPHER:  Going back on the
10     record.  The time is 5:02 p.m.
11         Q.  BY MS. LIVELY:  We're back on the record
12     in this matter.
13              Mr. Tran, do you realize you are still
14     under oath?
15         A.  Yes, ma'am.
16         Q.  During the time that you worked for Wells
17     Fargo, did you report your concerns about document
18     concealment to anyone outside the bank?
19         A.  I apologize.  Can you repeat it one more
20     time.
21         Q.  Yeah.  Did you -- Did you make a report to
22     the police, for instance, that you thought Wells
23     Fargo was engaging in some sort of unlawful
24     behavior?
25         A.  No, ma'am.
```



800.211.DEPO (3376)
EsquireSolutions.com
EXHIBIT 3
Page 123 of 125

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

1           Q.   What about the Securities and Exchange

2      Commission?  Did you report Wells Fargo to the

3      Securities and Exchange Commission?

4           A.   I apologize.  I did not know what Security

5      Exchange is.

6           Q.   What about the Department of Justice?

7                I'm trying to find out if you -- if you

8      reported what you considered to be unlawful conduct

9      to any agency outside of Wells Fargo.

10          A.   You mean myself --

11          Q.   Yes.

12          A.   -- or with the complaint?

13          Q.   No.  Yourself.

14          A.   No, ma'am.

15          Q.   Okay.  You started working for Wells Fargo

16     as a collector 2 on February 16th, 2004; is that

17     correct?

18          A.   Yes, ma'am.

19          Q.   And I will tell you that I'm looking at

20     Exhibit 62, if you want to look at it, which is just

21     your employee information sheet.

22          A.   Sixty-two?

23          Q.   Yes.

24               MS. STEPHENSON:  It should be in there

25     somewhere.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

EXHIBIT 3
Page 124 of 125

```
 1   STATE OF OREGON        )
                            )  SS.
 2   COUNTY OF MULTNOMAH    )

 3        I, MARILYNN HOOVER, CSR No. 04-0387 for the

 4   State of Oregon, do hereby certify:

 5        That prior to being examined, the witness named

 6   in the foregoing deposition was duly sworn to

 7   testify the truth, the whole truth, and nothing but

 8   the truth;

 9        That said deposition was taken down by me in

10   shorthand at the time and place therein named, and

11   thereafter reduced by me to typewritten form; and

12   that the same is a true, correct, and complete

13   transcript of the said proceedings.

14        Before completion of the deposition, review of

15   the transcript [X] was [ ] was not requested.  If

16   requested, any changes made by the deponent (and

17   provided to the reporter) during the period allowed

18   are appended hereto.

19        I further certify that I am not interested in

20   the outcome of the action.

21        Witness my hand this 23rd day of May, 2017.

22

23        _____

24        MARILYNN HOOVER, RPR

25        CSR No. 04-0387; Exp. 03/31/2020
```



Declaration of Leah C. Lively in Support of
Defendant's Motion for Summary Judgment

*800.211.DEPO (3376)*
*EsquireSolutions.com*
EXHIBIT 3
Page 125 of 125